# Haldeman *versus* The Pennsylvania Central Railroad.

*Land taken for public use by right of eminent domain does not revert to owner on cessation of use.—Title not divested by naked license or permission granted to adjoining owner to use lands thus taken.*

1. Wherever the Commonwealth, in the construction of her public works, acquired the fee simple in land taken therefor, either by purchase or through the exercise of her right of eminent domain, and the land was devoted to public use as a highway, a cessation of that use would not revest the title thereto in the former owner.

2. The title to land permanently taken and used for the construction of the Pennsylvania Canal, under the Acts of 1826, and 1827, became upon payment of the damages awarded by the viewers, absolute in the Commonwealth and passed to her grantee, the Pennsylvania Railroad Company, under the Act of 1857, providing for the sale of the main line of the public works: and did not revert to the grantee of the original owner, on a change in the course of the canal made by the canal commissioners before the sale.

3. A license or permission by the board of canal commissioners to the plaintiff's ancestor to construct a wharf on the berm side of the canal by excavating twelve feet back into his lot from the water-line, and the subsequent erection of the wharf and use for many years, could not divest the title of the Commonwealth, to the land thereby occupied, if it was within the line of survey reported by the viewers.

[Haldeman *v.* Pennsylvania Railroad Co.]

· ERROR to the Common Pleas of *Dauphin county.*

This was an action of ejectment by Richard J. Haldeman against The Pennsylvania Railroad Company, to recover a piece of land containing two thousand eight hundred and ninety-three and five-tenths square feet, equal to ten and one half square perches, situated in the city of Harrisburg, and formerly being a part of the bed of the old Pennsylvania canal, but which, by reason of the removal·or change of the canal at that particular point, under the Act of Assembly of 1857, was thrown out of the channel of the canal, filled up by the defendant in this suit, and appropriated to other uses and purposes from that for which it was originally taken by the Commonwealth.

In the year 1827 the heirs of William M'Clay, deceased, were then owners of a large tract of land at the foot of Walnut street in the borough of Harrisburg, a large portion of which land has since been included within the limits of the city of Harrisburg. In that year an inquisition was held on the estate of William M'Clay, and which was parted and divided among his heirs. Among the divisions of his estate there was one made to Sarah Irwin, who was one of the heirs of William M'Clay; and in the list of properties allotted to her was "a certain lot of ground situated between Fisher's road aforesaid and the Pennsylvania canal, bounded by Harrisburg on the south, by lot numbered four on the north, and extending along the canal one hundred feet, and defined in said diagram (annexed to inquisition) and numbered therein five; and also all the ground in front of the same as far as the middle of the canal."

The title to this lot of ground being thus vested in Sarah Irwin aforesaid, a joint petition by the heirs and legal representatives of William M'Clay, deceased, was presented to the Quarter Sessions of Dauphin county, in January 1828, praying the court to appoint viewers, as then provided by law, to view the premises and assess the damages done to the land of the petitioners, by reason of the Pennsylvania canal being located upon and passing through the lands and tenements there referred to. Of these lands and tenements the lot No. 5, above referred to, and the ground in front of the same to the middle of the canal, formed a part.

Viewers were appointed by the court, as petitioned for, who met upon the ground, viewed the premises, and made their report, assessing the damages at $1450, which was subsequently paid; Mrs. Irwin, the heir, through whom the plaintiff claimed, recovering her share of the damages assessed. Eight acres and seventy-two perches of land were taken there by the Commonwealth for the various purposes of the canal.

To this report exceptions were filed by the attorneys for the Commonwealth, which, having been considered and acted upon by

[Haldeman v. Pennsylvania Railroad Co.]

the court below, were, on the 24th of January 1829, overruled and the report of viewers approved of by the court; which action of the lower court, on the case being removed to the Supreme Court by *certiorari*, was affirmed July 3d 1834.

Sarah Irwin, by deed dated 28th day of March, A. D. 1829, among other properties there referred to, sold and conveyed to Jacob M. Haldeman, the father of the plaintiff in error, the aforesaid lot No. 5, and all the ground situated in front of the same to the middle of the canal. And the executors of Jacob M. Haldeman, by their deed dated February 19th 1857, sold and conveyed the same, with all the appurtenances, rights, and privileges, to Richard J. Haldeman, the plaintiff in this suit.

On the 9th of January 1833 the canal commissioners passed a resolution permitting Jacob M. Haldeman to construct a wharf on the berm side of the canal by excavating twelve feet back into his lot from the water-line of the canal; the wharf to be not less than eighty-five feet long, and to be constructed under the direction of the principal engineer.

It was in evidence that Mr. Haldeman did construct this wharf in front of his lot, and used it as a place of business from that time up to 1857, when the location of the canal was changed or removed at that point, as before referred to.

Under the Act of 1857, Pamph. L., p. 571, § 84, the canal commissioners were authorized to change the location of the canal between State and Chestnut streets, in the borough of Harrisburg, and to make a contract with the Lebanon Valley Railroad Company as to the expense of the same, &c. After some negotiation on that subject between the canal commissioners and the Lebanon Valley Railroad Company, a contract was entered into between these parties by which the location of the canal between those streets and immediately in front of this lot of ground of Mr. Haldeman was changed or moved over to its present location, thereby, as was alleged, depriving the plaintiff's wharf lot of the use of the canal, and cutting his property off entirely from any benefit or advantage to be derived from it.

The old bed of the canal adjoining the line of this lot of the plaintiff, which was conveyed to him, was filled up, and on the old bed of the canal thus raised the defendants in error erected a carpenter shop and other buildings, and appropriated the ground to other purposes than navigation by canal-boats.

The plaintiff would not have objected to the change or removal of the canal at this point as was done, if the defendants had permitted him to move up or follow the canal to the extent of the ground conveyed to him, viz. " as far as the middle of the old canal," so that he might still have a wharf on the canal as heretofore, as a point of business for the use of his lot No. 5.

The Act of 1857, entitled an act " for the sale of the main line

of the public works," provided " that the purchaser of said main line shall take the same and its appurtenances, subject to all contracts and arrangements heretofore made by Act of Assembly or otherwise, for and in respect to the use of such works, and shall carry out the same with all persons interested therein, in the same manner as the Commonwealth or its agents are now required to do by law."

There was no dispute about the title of the plaintiff to lot No. 5, and the ground in front of the same " as far as the middle of the canal," except that in the opinion of the defendants in error, under the Acts of Assembly relating to the construction of the Pennsylvania Canal, and the judicial proceedings had in this case, the portion of ground included in the lines of the survey attached to the report of the viewers was condemned in fee in 1828 for the use of the Commonwealth and its assignee, for the canal and canal purposes, so that the defendants claimed a right to hold and use it for any purpose, or the right to sell it if they pleased to do so.

The plaintiff requested the court to instruct the jury as follows :—

1. That the Commonwealth having taken the land in dispute, constituting the bed of the old canal, immediately in front of and adjacent to the lot of the plaintiff in this suit, for the purpose of locating and constructing the Pennsylvania Canal upon and through the same, became vested with the mere right of way or passage over this land for the canal, as an easement, under the various Acts of Assembly in relation to the location and construction of the Pennsylvania Canal, and the judicial proceedings which were had in reference to the land in dispute (which have been referred to the court in this case), and having been taken for a certain specific purpose and object, to wit, to construct a water communication over this land, and the damages having been assessed in reference to the objects and purposes for which the land was taken and to be used, that neither the Commonwealth nor the defendants now owning the canal can use or appropriate said land constituting the old bed of the canal to another and different purpose from that for which the land was taken, whereby the rights and interests of adjoining lot-owners shall be prejudiced, or, as in the present case, entirely destroyed so far as the value of this wharf lot is concerned ; and that, whenever the Commonwealth, or its grantee, being the defendants in this case, shall abandon, or cease to occupy the land in dispute for the purposes and objects for which it was originally taken under the Acts of Assembly and judicial proceedings before referred to, the original owners of the land, or, as in this case, their grantee, who is the plaintiff in this suit, would be entitled to recover the possession of said land.

2. That under the Acts of Assembly in relation to the construction and location of the Pennsylvania Canal, and the judicial

[Haldeman v. Pennsylvania Railroad Co.]

proceedings which were had in reference, among others, to the piece of land in dispute, the fee simple in the soil was not divested, but remained in the original owner, subject only to the right of way or passage over the same in the Commonwealth or her grantee, for the use of the canal, as before referred to; and that whenever this right of way or passage shall be abandoned or the bed of the canal changed or removed to other ground, the fee would revert to the original owners or their grantee.

3. That if the jury believe from the evidence that Mr. J. M. Haldeman, under the authority of the canal commissioners, as per their resolution of January 9th 1833, constructed a wharf on the berm side of the canal by excavating twelve feet or more back into his lot from the old water-line of the canal, which was a part of the front of the lot now owned by the plaintiff, that the said plaintiff would be entitled to recover in this suit these twelve feet of ground extending along the whole front of his said lot, irrespective of that part of the land in dispute constituting the bed of the old canal, or as it was originally constructed.

4. That in the present case, if the jury believe the Pennsylvania Railroad or Canal Company required the land in dispute for the purposes of a landing and depot for the uses of the canal, as stated in Mr. Wireman's evidence, it was their duty to have applied for and taken said ground in the manner pointed out by the various Acts of Assembly in relation to that subject, either by having the damages assessed as therein provided, where the parties could not agree upon the amount of damages claimed, or by tendering a bond, as directed in the second section of the Act of 1856, and in this way all the rights of the parties and the damages sustained, or likely to be sustained, by the taking of this ground for the purposes aforesaid, could be fairly and fully considered and determined.

The court below (PEARSON, P. J.), after stating the main facts, charged the jury as follows:—

" The case mainly turns on a question of law. The facts are scarcely disputed, and yet there are one or two which will be submitted to the jury. The primary and main point is, what title did the state take in the property of McClay by the assessment and payment of damages for that portion thereof occupied by or surveyed for the use of the canal? If a fee simple passed to the Commonwealth to the extent of the survey made and returned by the viewers, the plaintiff has no title to the land within that survey. If only a right of way was acquired by the state, and the title remained in the former owner, the abandonment of the soil by the change of the location of the canal will leave the right in the plaintiff, and he will be entitled to recover.

" The general principle has been long and clearly settled, that when the soil of an individual is appropriated to the use of a public

highway, whether a canal, railroad, turnpike, or ordinary county road, the fee remains in the former owner, and the public has but a right of passage; and on the abandonment or disuse of the ground as a way, the owner can reclaim or reoccupy it. See Angell on Highways, § 301, and note 1, where many authorities are collected; also 6 Mass. R. 454. And these principles are applied to canals and railroads: § 310. See note 2.

" Such is the rule in this case, unless the character of the right or nature of the estate in the land is changed or modified by statute. To ascertain this we must look into the Acts of Assembly, by virtue of which the land was taken, and the damages assessed. The 8th section of the Act of February 25th 1826, provides that the canal commissioners may agree with the owner for the purchase of the land through which the canal is intended to pass, or for its use and occupation by the state, and in case of any inability to agree for any of the reasons given, a justice of the peace is to be applied to, who was directed to issue his warrant to the sheriff to summon a jury to *value the land*, and all damages the owner shall sustain by cutting the canal through his land, or the partial or temporary use or occupation of the same. It is further directed that ' upon every such valuation the jury is to describe and ascertain the bounds of the land by them valued, and the quality and duration of the interest and estate in the same required by the board for the use of the state, and their valuation shall be conclusive on all persons, and shall be paid for by the said board to the owner, or his legal representatives; and on payment thereof the state shall be seised of such lands as of an *absolute estate in perpetuity*, or with such less quantity and duration of interest or estate in the same, or subject to such temporary appropriation, use, or occupation as shall be required and described as aforesaid, as if conveyed by the owner or owners.'

" The 8th section of the Act of April 9th 1827 changes the method of assessing damages, and authorizes the owner of the land who considers himself injured by the canal passing through his property, or interfering with his rights, to present his petition to the Court of Quarter Sessions of the proper county within one year after the completion of the work, and have five viewers appointed, who, after taking into consideration the advantages and disadvantages, shall report the damage, if any, which the owner may have sustained by reason of said canal. The same section also provides for the board purchasing small pieces of land cut off or injured by the canal, where they deem it expedient, in preference to paying the damages, and selling so much thereof as shall not be required or occupied by the canal. It also provides generally for the canal board purchasing from the owner any land through which the canal passes, or is intended to pass or agreeing for the use and occupation thereof.

[Haldeman v. Pennsylvania Railroad Co.]

" The 8th section of the Act of March 24th 1828 makes provision for the canal commissioners calling on the owners of land through which the canal has been or is about to be located, for releases of damages, and where the demand is great or exorbitant, or there is good reason to believe that the same will be such, to change location if practicable.  These are all the laws in force on this subject at the time the damage done to this land was assessed, and none of the statutes make any mention of the duration or extent of interest to be taken by the Commonwealth, except the Act of 1826, which declares that it shall be ' an *absolute estate in perpetuity*,' or such less duration of interest or temporary occupation as may be required and described, and gives the state, as we understand it, the same interest ' *as if conveyed by the owner or owners*.'  It would seem that from the beginning disputes arose as to the extent and duration of the interest taken by the state in the land occupied by the canal where damages were assessed and paid to the owner thereof.  At January Quarter Sessions 1828, W. McClay's heirs presented their petition for the appointment of viewers to ascertain the damage due to their property.  This was done, and report made to August Sessions 1828.  The viewers in their report say, ' that the owners of the premises, by reason of the Pennsylvania Canal passing through the said lands and tenements, and occupying the following described parts of the same,' &c. [here follows a minute description of the land by courses and distances, amounting in all to eight acres seventy-two perches, and annexing a draft thereof], ' have sustained damage to the amount of fourteen hundred and fifty dollars.'  Exception was taken to the confirmation of the report, *inter alia*, ' because no title to the premises was exhibited to the viewers, although the title in fee simple was required for the use of the state, and the counsel of the petitioners declared that no title would be given for the land covered by the canal.'  The excessive character of the damages was also complained of, but the exceptions were all eventually overruled, and the report confirmed, which was ultimately affirmed in the Supreme Court, and the money paid by the state agents.  A careful survey was made by a competent artist of the ground occupied, and annexed to the report; and Colonel Roberts, the surveyor, testifies that he run off the land by the foot of the embankments on the one side, and so as to embrace all of the ground in any manner used by the canal on the other, and thus included all of the territory taken by the Commonwealth within his diagram.  That is, all covered by the canal and basin, their embankments, and the towing-path, which was then on the western side of the canal.  The nature and extent of the estate acquired in the land by the Commonwealth came under the consideration of the Supreme Court in this and many other cases (thirteen in all) in The Commonwealth v. McAllister and others, 2 Watts 190,

[Haldeman *v.* Pennsylvania Railroad Co.]

in which Judge Kennedy, in a carefully-considered and elaborate opinion, defines and settles what portion will be wanted temporarily, and what permanently, under the Acts of 1826–7, showing that each is sufficiently defined and fixed by the character of the occupancy. He there declares, at page 196, 'when the work is completed through the land, the precise quantity which will be wanted in perpetuity for the canal, would be most distinctly and permanently marked out by the work of the canal itself, and also that which was temporarily used in the construction.' And again, at page 197, the distinction is taken between ordinary highways and the public canal. In the former the title to the soil remains in the owner. 'It is different, however, as to the land used by the state in the construction of the canal. The right of property in the land upon which the canal is made becomes vested by the operation of the Act of 1826, according to its express terms, in the state, so that the owner loses all his former right to it. The intention of the legislature is very clearly manifested by the acts passed on this subject, and it is that the state shall pay for every foot of land taken by her from the owner so far as he has not been compensated for it by the advantages which may reasonably be expected to accrue to him by the canal's enhancing the value of the residue of his land.' Again, at page 198, the judge declares: "The canal being finished through his land, it is obvious, then, that the state has no use after that for any part of the land except that upon which the canal has been located and made, which is necessarily wanted in *perpetuity*. The use to which it has been appropriated by the state is a sufficient indication of the quantity and duration of interest and estate that is required by her in it, and the applicant has clearly a right to claim compensation for the fee simple of it.' In this and other parts of the opinion the learned judge shows the difference between the temporary occupation of the land during the construction of the public works and the parts wanted permanently, which is sufficiently indicated by the character of the works themselves, as well as by the surveys appended. We are not aware of any later or other decision on the subject, or that the authority of this case has ever been shaken or questioned. It is perhaps the only judicial exposition of the Acts of 1826 and 1827. Subsequent legislation may have changed the character of the estate taken by the Commonwealth, but these damages were assessed under those two laws. This decision is binding upon us, *although it does not accord with my views.* [We therefore instruct you that the title to all of the land embraced within the survey made by Colonel Roberts, and annexed to and made part of the report of the viewers, and described by them by courses and distances, passed to the Commonwealth in fee simple, and that the plaintiff has no right to the same, or any part thereof. That the state, having

taken the fee, could sell or use it for any purpose as absolute owner,] and that the right does not differ in principle from The Union Canal Company v. Young and others, 1 Whart. 410, where it was decided that the fee simple passed to the company on the canal being abandoned; not so much as we understand by the informal release executed by the owner, as by virtue of the Act of Assembly under which the land was taken. We are aware of the inconvenience to property-holders through which the canal was made, by establishing the doctrine of this decision, as it will leave long strips of their land to pass into the hands of strangers by sale on the change or abandonment of the improvement; but that may be measurably obviated by their becoming the purchasers. It may also conflict with the opinion of the legal profession through the state, and certainly does with the habits and practices of the people, who have, as in the cases presented on this trial, very generally followed up any change in the location of the public works by immediately retaking possession of the part abandoned. This was seldom if ever prevented by the canal board, who from the constant change of its members rarely knew of the encroachments, or if known, it was thought to be a matter of small moment, and the occupation of the immediate line, to which the change was made by the erection of wharves and warehouses, tended to the increase of trade. No neglect of the canal commissioners can give title to an intruder, or destroy that of the Commonwealth. It is a maxim of the law that the public shall not suffer through the negligence of its officers. No title was therefore acquired by Mr. Haldeman through the length of time he held possession of the wharf, which is the next point to be considered.

"It seems that some time between the year 1827, when the canal was completed through the McClay property, and the 9th day of July 1833, the towing-path had been changed from the west to the east side of the canal at this point, for on that day Jacob M. Haldeman, by a resolution of the canal board, was authorized to construct a wharf on the berm side of the canal, under the direction of the principal engineer, by excavating back twelve feet into his own lot, and making the same not less than eighty-five feet long. This was done, and that wharf kept up from the time of construction until the location was changed a few years since, and the former site of that wharf is now in part occupied by the defendant's buildings. Twelve feet back from the water-line would perhaps carry the face of the wharf back nearly to the outer line of the former towing-path, as the same was required by law, and is proved to have been ten feet wide, was about two feet above the water-line, and some eighteen or twenty inches below the adjoining soil, which, allowing for the necessary slopes, would make probably about fourteen feet. That

14 WR.—28

is a question for you. [We are of the opinion, and so instruct you, that neither the original permission to erect the wharf, nor its subsequent occupation and enjoyment, could divest the estate of the Commonwealth, which could reclaim the land when it thought proper, as it had bought and paid for it in fee simple, provided it was within the line of survey reported by the viewers.] Wharves were necessary for the benefit of trade, but none could be built without the permission of the canal commissioners, as provided in the 9th section of the Act of April 10th 1826, were temporary in their character, and would cease on the change of the canal or the cessation of its use. When on the property of the state the title thereto would remain as before the grant. Speaking of it as Mr. Haldeman's lot for twelve feet back of the water-line did not make it so, if the title had been previously divested and paid for by the state.

"The plaintiff's counsel has pressed on our consideration a decision made by this court in the case of Zeigler *v.* The Philadelphia and Reading Railroad Company. We consider that the difference is obvious between that and the cause on trial. We determined, after careful consideration, that the owner of property was not divested, where the viewers decided that the benefit derived by his land from the construction of the canal was equal to the injury done, and therefore awarded no damages. The owner sold the land to the railroad company, on the one side, bounded by the canal, but retained on the other side, which we held extended to the centre. On the canal being removed, we determined that the railroad company could not take possession of the one-half of the canal site retained by Mr. Zeigler, but that the same belonged to him; his title could not be divested by illusory benefits, after the same had ceased by an alteration in the line of canal. We consider the case entirely different from one where the owner was paid the full value of his property, and accepted the consideration. We are aware that great hardship may exist when the damage allowed and paid is merely nominal, and the owner compensated for the loss of property mainly in the benefits expected to be derived from the public works, but we do not consider such to be this case. On the contrary, the Supreme Court, in affirming the judgment in this case, remanded before it by the officers of the Commonwealth, declared the title to be divested, and the fee to have passed to the state. It is undoubted that the Pennsylvania Railroad Company took the canal with its appurtenances, subject to all of the contracts and arrangements made by the Commonwealth with individuals in relation to the occupancy of their property, or the use of the works, as provided by the 7th section of the Act of May 16th 1857.'

"We will now proceed to answer the points:—

"1. The title of the state in the soil was not a base, or quali-

fied, or conditional fee, but was absolute when paid for. The land would not revert to the former owner on changing the canal. This point is fully answered in the negative in the general charge.

" 2. This point is negatived. The fee passed to the state according to the lines surveyed and reported by the viewers of damages, and did not revert.

" 3. Haldeman could not build the wharf even on his own land alongside of the canal, without permission. He had power to construct it on his own land, by the resolution of the board. If built on that of the state, the title did not pass to him. The state could take the land if within its lines, and this action of ejectment cannot be sustained if the railroad company has possession of no land outside of the survey returned by the appraisers of damages.

" 4. If the shops of the company are on the plaintiff's land, it is no defence against this action that the company required the ground for the navigation of the canal. If needed for that purpose, it must proceed under the Act of Assembly to take, and must then pay for it. If the land belonged to the state before, it passed to the railroad company by the sale, and can be retained.

" The only point of any moment submitted to the jury is as to the location of the Roberts survey, made for the viewers of damages. If the land claimed by and in possession of the defendants is all within the lines of that survey, the plaintiff cannot recover. If any portion of it is west of that line, the plaintiff is entitled to recover that portion. This survey, Colonel Roberts says, was made according to the works then completed, so as to embrace all the embankments on the one side to their very foot, and he thinks all of the ground occupied by or used for the towing-path on the other. An inquisition had been held on the property of W. McClay in October 1827, which was confirmed in December of the same year, by which the property was divided among the heirs, and at that time the canal, basin, &c., were run out by Mr. Roberts by the same lines run for the viewers of damages soon after. Since this last survey we do not understand that he has traced these lines, but Mr. Runk and Mr. Hage both testify that they made surveys of the ground as near as practicable by those made by Roberts, and they differ very little in their lines, probably not over a foot or two at any point. They make the quantity of land about the one-ninth of an acre more than Colonel Roberts, in nearly eight and a half acres. From this you may probably infer, without difficulty, that they were not far from the former survey. Mr. Runk says that their western line was many feet west of the shop now held by the defendant. If that line is correct, or nearly so, the defendant cannot have any land in possession to which the plaintiff has a title, on the principles already decided. We do not perceive that this conflicts with the testimony of Colonel Roberts, who spoke not of the lines run by

him, as we understand it, when he stated that the embankment of the canal on the western side was a straight line from the bridge down before the different wharves were made, but of the water-line of the canal prior and subsequent to the changing of the towing-path.   The evidence as to these lines is therefore scarcely contradicted, but it is a question for the jury, and if you believe that the defendants are within the lines of the original location of the canal, as reported by the viewers, the plaintiff cannot recover."

Under these instructions there was a verdict and judgment for defendants; whereupon the plaintiff sued out this writ, and assigned for error so much of the charge of the court as is printed above in brackets, and the answers given to plaintiff's points.

*John H. Briggs* and *Robert A. Lamberton*, for plaintiff in error.

*John C. Kunkel*, for defendants in error.

The opinion of the court was delivered, June 29th 1865, by

Strong, J.—In most cases in which the Commonwealth has appropriated the land of a private owner for a public highway, it has not attempted to take the fee simple.   The Road Laws gene-rally contemplate no more than fastening a servitude upon the land and devoting it to public use as a highway.   A right of pass-age is all that is taken, while the fee is left undisturbed in the private owner.   Hence when the public right of passage is given up, the servitude of the land is gone and the owner holds it disen-cumbered of the public right, and as if the Commonwealth had never interfered with his enjoyment of it.   It is not to be over-looked, however, that this is because the Commonwealth made at first but a partial appropriation.   If in any way the title of the owner has been acquired by the public, if the Commonwealth has purchased the fee, or taken it through the exercise of its right of eminent domain, and if then the land has been devoted to public use as a highway, a cessation of that use can revest nothing in the former owner.   His rights are gone and he cannot resume possession.   It is then a fundamental inquiry in this case, what was the extent of the appropriation made when the Commonwealth took the land in controversy between these parties.   Was it a mere right of passage that was taken, or was it the ownership of the land in perpetuity ?   It is very evident from the Act of Assembly of February 26th 1826, entitled " An act to provide for the commencement of a canal, to be constructed at the expense of the state and to be styled ' The Pennsylvania Canal,' " that the purpose of the legislature was to secure the acquisition, in absolute ownership, of the lands through which the canal was intended to pass, so far as those lands were designed to be actually and per-

manently occupied by the canal. Two kinds of occupation were plainly in view; one permanent and continuing, and the other temporary or of limited duration, such as might be required for the deposit of materials or accommodation of the workmen while the canal was in process of construction. Hence the viewers were required to value the land and all damages the owner or owners should sustain by reason of cutting the canal through such land and the partial or temporary appropriation, use, or occupation of such land, and they were also required to describe and ascertain the bounds of the land by them valued, and the quality and duration of the estate in the same, required by the agents of the Commonwealth for the use of the state. The act then proceeded to declare, that on payment of the valuation made by the viewers, the state should be seised of such lands as of an absolute estate in perpetuity, or with such less quantity and duration of interest or estate in the same, or subject to such partial or temporary appropriation, use, or occupation, as shall be required and described as aforesaid, as if conveyed by the owner or owners. Thus a clear distinction was made between land required for temporary use and that taken for the canal itself. Of the former it was in substance declared, that the seisin of the Commonwealth should continue only so long as the temporary use was required. Of the latter, the seisin was declared to be in perpetuity, as if conveyed by the owner or owners. Nowhere in the act was any authority given to the viewers, when the assessment became necessary, in consequence of the disagreement of the parties, to assess damages for a right of passage alone, such as is appropriated under our road laws generally or under laws incorporating canal and railroad companies. Necessarily, therefore, the appropriation of that which was required for permanent use was an appropriation in fee.

The Act of 1826 was followed by that of April 9th 1827, which made some changes in the mode of ascertaining damages. It authorized the owner of land considering himself aggrieved by the passage of a canal through his land, to present his petition to the Court of Quarter Sessions of the proper county within one year after the completion of the work, and it directed the appointment of five viewers to view the premises and report such damage, if any, as they or any three of them should think the owner had sustained by reason of said canal, taking into consideration the advantages of said canal to the petitioner. This act also empowered the board of canal commissioners to make an amicable adjustment of any damages whatever, sustained by the owner or owners of any land through which any canal or railroad, to be made at the expense of the state, passes or is intended to pass ; a provision not found in so large terms in the Act of 1826. There is no direct reference in this second act to the estate or quantity of

interest which the Commonwealth should acquire, in the lands appropriated without purchase and for which the compensation to be made was to be settled by viewers, and, if it is not to be construed in connection with the first act, there is nothing in it that gives any different effect to the appropriation from that which generally results from laws providing for taking private property for public use as a highway. Standing alone the act does not seem to contemplate an acquisition of the fee by the Commonwealth. But the Acts of 1826 and 1827 are *in pari materia.* They both relate to assessments or valuations of lands taken for the Pennsylvania Cânal. The latter act does not repeal the former, except so far as it makes inconsistent provisions for compensating owners of lands taken. It follows that both acts must be construed together, as parts of one system. It is then to the Act of 1826 that we must look for the nature and extent of the interest which the Commonwealth obtained by the appropriation of lands for the canal and by the assessment and payment of the valuations. Such was the rule adopted by this court in Commonwealth *v.* McCallister, 2 Watts 190, where the nature and extent of the estate acquired by the Commonwealth came into consideration. There it was practically ruled that though proceedings for assessments were commenced under the second act, their effect was determinable by the first, and it was said the main purpose of the legislature, in the enactment of 1827, was to postpone the application for an assessment until the completion of the work through the land of the applicant.

It is argued, however, by the plaintiff, in this case, that the Commonwealth did not acquire ownership in perpetuity of the land now in controversy, because that when the viewers made their valuation and assessment, they did not ascertain and describe the quality and duration of the interest and estate in the same, required by the board of canal commissioners for the state. This, it is said, was made their duty by the Act of 1826, and it is insisted that, they having failed to report a perpetual duration of the estate, the Commonwealth acquired only an easement to continue while the land taken should be used by the canal. This argument sacrifices substance to form. It leaves out of view the declared purpose of the Act of 1826, to which a description of the quality and duration of the estate required was manifestly subordinate, and it overlooks the change wrought by the Act of 1827. Under the Act of 1826, in all cases where, in consequence of disagreement between the canal commissioners and the owner or owners of land, a view and an assessment became necessary, the legislature contemplated no other acquisition of title to land intended for permanent occupancy than an estate in perpetuity. The viewers were not left at liberty to value a less interest in such lands. They might assess damages for so much as was intended

[Haldeman v. Pennsylvania Railroad Co.]

for temporary use, but for so much as was required for permanent enjoyment, their plain duty was to value the fee. Nor was it for them to determine that the Commonwealth should take less than a fee, nor even what should be the duration of interest in what was required for temporary use. This was to be determined by the board of canal commissioners. It was what was required *by the board* for the use of the state that they were to value and to describe, and it was of that thus *required* and described, not of that the viewers might think necessary, that the law defined the seisin of the state. As already remarked, a distinction was marked between such as was required for permanent occupation and that required for temporary use. That required for the bed of the canal, its tow-paths and embankments, as was the land now in controversy, could only have been designed for permanent use, and in fact the fee was required. In addition to this, the Act of 1827 made it unnecessary for the viewers to ascertain and describe the quality and duration of the interest and estate required in lands upon which the canal itself was located. Under the Act of 1826 proceedings for valuation could have been instituted before any work was done upon the land of an owner. In such a case it was necessary, not only to describe the bounds of the land valued, but the uses for which it was required, whether temporary or permanent. But when by the Act of 1827 it was provided, that valuations and assessments should not be made until after the completion of the work, the reason for requiring a description of that intended for permanent use ceased. The extent of the property thus appropriated was defined on the ground, and the nature of the interests required was plainly indicated. There was no *longer* temporary use, and that which was permanently appropriated was marked out. Upon this subject the language of the court in Commonwealth v. McCallister is very plain. One of the exceptions in those cases was " that the owners (viewers ?) did not ascertain and report the quality and duration of interest in the premises required by the canal commissioners for the use of the state, as required by law and the order of the court." Upon this the court said : " By the Act of 9th of April 1827, the viewers are not to be called upon to view the ground and make report until after the work of the canal has been completed through the land of the applicant. The canal being finished through his land, it is obvious then that the state has no use, after that, for any part of the land, except that upon which the canal has been located and made, which is necessarily wanted in perpetuity. The use to which it has been appropriated by the state is a sufficient indication of the quality and duration of interest and estate that is required by her in it, and the applicant has clearly a right to claim compensation for the fee simple of it. Any portion of the applicant's land which was used for temporary purposes, in

[Haldeman *v.* Pennsylvania Railroad Co.]

making and constructing the canal, is not wanted after the work of the canal on the ground has been finished, and therefore it is not necessary to report in regard to it, further than to make to the owner thereof a proper allowance for his temporary exclusion from the enjoyment of it, in settling and adjusting the amount of compensation which ought to be given for the whole loss and injury sustained. To set it forth by metes and bounds and the quality and duration of interest and estate which the canal commissioners or the state had the use of, in making the canal, would be perfectly useless." The court then went on to declare, that the requirement, in the order to viewers, to make reports upon this subject was surplusage, because, as they said, it was "not required or authorized by the Act of 1827, which in effect repeals the Act of 1826 in what is thereby required to be reported on this point." Commonwealth *v.* McCallister thus determines, that it is not essential to the acquisition of a fee by the Commonwealth that the viewers ascertain and describe the quality and duration of the interest and estate required. What is taken for the canal is acquired in perpetuity.

It is urged, that if a fee is acquired great injustice may be done to owners of lands by an abandonment of the canal or a change of its location, thus depriving owners of the advantages which the jury were required to take into consideration in assessing the damages. This may be admitted unless the viewers considered also the possibility of such abandonment or change. Perhaps it ought to be presumed they did take into account such a possibility, but if not, the injustice, if any, is chargeable to the Acts of Assembly. It is remediless by us.

The other question raised by this writ of error relates to the effect of the license given by the canal commissioners to Jacob M. Haldeman, the father of the plaintiff, on the 9th of January 1833. By resolution of that date the board permitted Jacob M. Haldeman to construct a wharf on the berm side of the canal, by excavating twelve feet back into his lot from the water-line of the canal adjoining the property now in dispute, the wharf not to be less than eighty-five feet long, and to be constructed under the direction of the principal engineer of the division. The wharf was accordingly constructed, and it was in use until after the defendants purchased from the Commonwealth and until the location of the canal was changed. In reference to this state of facts, the court instructed the jury that neither the original permission to erect the wharf, nor its subsequent occupation and enjoyment, could divest the estate of the Commonwealth, which could reclaim the land when it thought proper, as it had bought and paid for it in fee simple, provided it was within the line of survey reported by the viewers. Of this instruction the plaintiff complains. But if the title to the fee was in the Commonwealth when the permis-

[Haldeman v. Pennsylvania Railroad Co.]

sion was given to build a wharf on adjoining land, we are unable to see how that permission, though followed by the erection of a wharf in pursuance of it, and its continued enjoyment, could divest the title previously held by the state. Manifestly it was not intended to work any such effect. We are referred to the 7th section of the Act of 1857, providing for the sale of the main line of the state canals, in which it was enacted " that the purchasers of said main line shall take the same and its appurtenances, subject to all contracts and arrangements heretofore made by Act of Assembly or otherwise, for and in respect to the use of such works, and shall carry out the same with all persons interested therein, in the same manner as the Commonwealth or its agents are now required to do by law." But did the arrangement of the canal commissioners with Jacob M. Haldeman give him title to land which he could recover in ejectment? Assuredly not. It was at most but a license, and revocable at pleasure : Monongahela Navigation Co. v. Coons, 6 W. & S. 101 ; Susquehanna Canal Co. v. Wright, 9 Id. 9 ; Railroad Co. v. Young, 9 Casey 175. If it were more than a license, if it were a contract, its breach is not remediable by ejectment.

The other assignments of error are only repetitions of those we have considered, and they require no other notice.

The judgment is affirmed.