# Wyoming Coal and Transportation Co. *versus* Price.

1. Whenever the Commonwealth took lands for permanent use under the internal improvement Acts of April 11th 1825, February 26th 1826, April 9th 1827, March 24th 1828, and similar acts, and constructed and operated a canal on it, she acquired an estate in such land in perpetuity and may dispose of the same in fee.

2. All the improvement acts were part of the same system, are in *pari materiâ* and are to be construed in connection with each other.

3. *Temporary* use, mentioned in the acts, applied to the use and possession of the land during the construction of the canal; *perpetual* use is restricted to that portion permanently occupied after its completion.

4. When land is procured for building a canal thereon the presumption is that the right of soil is acquired and not a mere easement.

5. Hancock conveyed to Price two lots of land opposite to each other on the different sides of the North Branch Canal, each bounded on the canal. The Commonwealth sold the canal to a corporation: *Held* that the fee in the land occupied by the canal was in the Commonwealth and passed to the corporation; that Price had no title to it nor to the coal under the canal.

6. The defendants occupied a colliery adjoining Price's land; they mined over their line into his land; they agreed with Price to pay for the coal mined on his land and all that they might mine for eight months thereafter, at a fixed rate per ton; they took coal from under the canal between the line of Price's lots. *Held* that the relation of landlord and tenant did not exist between Price and defendants so as to prevent the defendants denying the title of Price to the coal under the canal.

7. By the agreement Price was to have access to the mines and the mine accounts to ascertain the quantity mined; quarterly returns were furnished by defendants to end of the term, January 1st, paid for and received by Price without objection, he not having examined the mines nor the accounts. The mine was flooded by a break in the canal, July 4th, so that an examination could not afterwards be made.    Price having acquiesced so long, *held* the presumption was that the returns were accurate.

8. Under the facts the charge of the court unduly prejudiced the case.

9. Commonwealth *v.* Fisher, 1 Penna. R. 462; Commonwealth *v.* McAllister, 2 Watts 190; Craig *v.* Allegheny, 3 P. F. Smith 477; Haldeman *v.*

[Wyoming Coal and Transportation Co. *v.* Price.]

Pennsylvania Railroad Co., 14 Wright 425; Robinson *v.* West Pennsylvania Railroad Co., 22 P. F. Smith 316; Union Canal Co. *v.* Young, 1 Whart. 410, approved and followed.

February 21st 1876.　　Before AGNEW, C. J., SHARSWOOD, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Error to the District Court of *Philadelphia :* Of July Term 1874, No. 124.

This was an action of assumpsit brought November 6th 1872, by Eli K. Price against The Wyoming Coal and Transportation Company.

On the 8th of August 1848 James Hancock conveyed to the plaintiff two pieces of land in Wilkesbarre township, Luzerne county, one of them " beginning at a corner in the line of lot No. 36, &c., on the northwest side of the Pennsylvania canal, thence from the towing-path of said canal on the line of said lot No. 36, north, &c., 160 perches to the Susquehanna river, thence by the Susquehanna river south, &c., parallel with the first-mentioned line 160 perches to the towing-path of said canal, thence by the said canal, &c., to the beginning, containing 20 acres, &c., being part of lot numbered 37," &c.　　The other lot was " on the southeast side of said canal, opposite the above-described land, &c., beginning in the line of said lot No. 36, thence from said canal south, &c., by line of said lot No. 36, &c., 20 perches, &c., thence parallel with the first-mentioned line 8 perches to the said canal and thence by said canal 20 perches to the beginning, containing one acre, being also part of said lot No. 37," &c.　　William Longstreth also had an interest in this land.　　The defendants, during the years 1869, 1870 and 1871, were lessees of the Burroughs colliery adjoining the above-mentioned tract on the northeast; about the latter part of the year 1869 they mined over the line of that colliery into the plaintiff's land.

The canal mentioned in the deed had been constructed by the Commonwealth and was what had been known as the North Branch Canal.　　Under Act of April 21st 1858, Pamph. L. 414, this canal, with other parts of the public works, was sold to the Sunbury and Erie Railroad Company, " with all the property thereto belonging or in anywise appertaining, and all the estate, right, title and interest of the Commonwealth therein."　　The act provided that the company and their successors and assigns should keep up the canal with the bridges and private crossings as the canal commissioners had theretofore done, and that it should remain a public highway for ever; that they should take subject to all contracts and arrangements made by Act of Assembly or otherwise, &c., as the Commonwealth was required to do by law; and that all claims for damages or other demands against the Commonwealth in relation to the location and construction, &c., of the canal should be paid by the purchasers.

[Wyoming Coal and Transportation Co. *v.* Price.]

On the 28th of March 1870, J. S. Price, Esq., the son and agent of the plaintiff, wrote to the president of the defendants, advising him that he had been informed that the defendants had been taking coal from plaintiff's land and were "also approaching with your works the river Susquehanna, the coal under which also belongs to Mr. Price and Mr. Longstreth." The agent asked for an interview with the president that the claim of plaintiff might be amicably adjusted.

On the 8th of April 1870 the president replied that they had unintentionally crossed "the line and mined a small amount of coal off of your property. As soon as we found by survey that we were on your property we ceased mining, had a careful estimate made by competent engineers, and returned to you the amount so mined (usually in such cases the owners of property are left to ascertain such facts, and in many cases we have known parties let down the roof so that the owner could not get in his property under ground), and gave you the same price that we are paying for our own property with improvements on. In all candor we would say, that 25c. a ton for undeveloped property in this region is a price paid at but few most favorably located places, nor could you get a jury in Luzerne county that would allow that amount of rent under the circumstances. As for damages to your property, except the mining out of this coal in an upper vein, I think you would have difficulty in showing to a jury that you had sustained any. The above is of course only my opinion. You must therefore not think it unfair in us to prefer letting the law take its course, after reading your letter to your agent, Mr. Brown, in which you said that unless we paid 60c. a ton, you would bring suit for amount of mine rent and damages done.

"We would here say, if perfectly satisfactory to you, we will allow you 35c. a ton for what we mined, in place of 25c., as offered before. We make the outside offer, in order to effect an amicable settlement." * * *

The agent replied, May 6th 1870, that Mr. Longstreth, the plaintiff concurring, directed him to say:—

"I consent to letting J. H. Swoyer have the coal that he has mined from our land at 35c. per ton, and also such as he may take therefrom for the balance of the year, but I think that a provision should be made for his mining for the eight months to January 1871, not less than 3000 tons per month, at 35c. per ton, &c. * * * The agreement only to continue until the 1st of January next, the returns of the engineer of the coal taken to be made monthly on the first day of each month, and the payments to be made to me at Philadelphia each month. The coal to be taken out regularly as you proceed, and, if it is desired by the owners they can examine the workings by themselves, or their agents, or engineers, to see that the mining is done to their satisfaction. Please

[Wyoming Coal and Transportation Co. *v.* Price.]

let me know if these terms are agreed to by you, and also send me check or draft on New York or Philadelphia for the amount already mined by you, as per your report of October 22d 1869, showing that up to said date 3829 tons had been mined by you. 3829 tons at 35c. per ton amount to $1340.15."

The president replied May 11th 1870:—

"Your favor of the 16th inst. duly received. Contents noted. I have instructed our Treas. to forward you check to morrow for ac. I am sorry to say that we cannot accept your proposition to mine coal from your property; it is no benefit for us to mine it if we have to pay more than what we are paying to Burroughs, namely, 25c. a ton, besides we cannot agree to mine out any given amt. per month, but would mine of it as much as we could conveniently at 25c. a ton."

The agent replied May 14th 1870:—

"I have your fav. of 11th inst., and have sent it to Mr. Longstreth. * * * After one or two letters had passed between us you called at my office two or three times, and after a friendly talk in reference to your having trespassed upon our property and taken out coal without authority, you * * * said that you regretted what had been done, and hoped that there should be no litigation. * * * It was then proposed by you, that in consideration of settling the claim of damages on our part that you would not only give us 35c. per ton for the coal already taken, but the like sum for what you *would take* between this and the 1st of January next, the time of the expiration of your lease with Mr. Burroughs, * * * that as you had trespassed upon our land you felt morally bound to pay us more than you were paying Mr. Burroughs, and that you preferred, under the circumstances of Mr. Burroughs's treatment of you, in reference to a renewal of your lease, to take *our* coal at 35c. Acting upon that suggestion, I communicated your offer to Mr. Longstreth and my father, * * * they promptly agreed to it, and in consideration of our releasing the claim for damages, they yielded to your wishes, and agreed to take 35c. for that already mined and that to be mined. On May 6th 1870, I wrote to you to that effect. In reply I have your favor of May 11th, in which you wish to hold us to *our* part of the agreement and you *refuse your* part of it. That is, you say, that we are to release *our* claim for damages at 35c. for coal taken (when *our* courts would have given us much more), and you are *not* to pay 35c. for the amount to be taken, although that was clearly *part* of the agreement. * * * I reported to them your offer, and that I was pleased at the manner in which you acted, and hoped that we would have all the matters settled amicably between us, and so *much* confidence had I in you that I suggested that it was not even necessary to go through the formalities of a *written* agreement, but that your word, offering the 35c., was sufficient without the matter being reduced to writing. Am I therefore to tell them that I was wrong?" * * *

[Wyoming Coal and Transportation Co. *v.* Price.]

The president replied May 17th 1870:—

"Your favor of 16th inst. this moment rec'd. Contents noted. In answer to the business part of your letter, I would say that you certainly misunderstood me. I at least never intended to say that we would pay you more for an unimproved property than we are paying Mr. Burroughs, where he furnishes all improvements. * * * I did not intend that the settlement of the old claim should have anything to do with the new transaction. I am perfectly willing, if it is your wish, that you should commence proceedings against us through the proper tribunal for the recovery of mine rent, as also for damages done you, provided you place the money we have paid you in escrow, or you acknowledge that you hold it in escrow pending the decision of the case, but I would not consider it as *part payment;* ere the suit is commenced all former settlement to be considered as naught. On my part such suit would be considered as amicable, and to save all trouble in getting service on me here I will designate at your request an atty. in Phila., who will accept service for us, provided you in return will agree to have the case disposed of as soon as possible. Or again, I will leave the case to three disinterested persons, you to name one, we to name one, and they to choose the third, and whatever they will decide I will abide by, provided you will agree to do the same.

"Now then, to the friendly part of your letter I would say that, inasmuch as you misunderstood me, and the 10c. a ton difference between us not making any large difference, I will agree to pay you 35c. a ton mine rent for all such coal as we may mine from your property between this and the first day of January next, but will not agree to mine out any given amount, the coal to (be) mined in workmanlike manner, &c. Your agent to have access to the mine acs. for the purpose of satisfying yourselves of how much has been mined; also to have free access to the mine to see that the coal is mined without damage to the property other than the mining of the coal. I make the latter proposition simply because you understood me to say so from the first, and because you reported so to your father and Mr. Longstreth."

The agent replied May 20th 1870:—

"* * * As you in the latter part of your letter agree to the 35c. pr. ton for all the coal to be mined between this and the first of January next, it will not be necessary, I am happy to say, either to bring suit or refer to an arbitration. I have therefore paid to Messrs. Longstreth and Price the money sent to me for the coal mined to October 1869, and we will accept the 35 cts. for all coal mined up to January 1st 1871, in accordance with the terms of your said letter of May 17th 1870." * * *

The returns furnished by the defendants to the plaintiff were as follows:—

[Wyoming Coal and Transportation Co. *v.* Price.]

Wilkesbarre, Pa., Oct. 22d 1869.

Mr. Eli K. Price : in account with Wyoming Coal and Transportation Co.

Statement of coal mined from the tract of land owned by Eli K. Price in Plains township, Luzerne county, Penna., in full to date.

By 3829 tons of coal.

Wilkesbarre, Pa., July 12th 1870.

\*     \*     \*     \*     \*     \*     \*

For mine rent on coal taken \* \* \* in June 1870.

By 460 tons of coal at 35 cents     .     .     .     . $161.00

Wilkesbarre, Pa., Oct. 10th 1870.

\*     \*     \*     \*     \*     \*     \*

1870, Sept. 30.     For mine rent on coal taken \* \* \* in July, Aug., and Sept.

By 510 tons of coal at 35 cents     .     .     . $178 50

Wilkesbarre, Pa., Jan. 19th 1871.

\*     \*     \*     \*     \*     \*     \*

1870, Dec. 31.     For mine rent on coal taken \* \* \* in Oct. Nov. and Dec.

By 1618 tons of coal at 35 cents     .     .     . $566 30

All these returns were accompanied by payments of their respective amounts, which were receipted for by the plaintiff.

The mine was surrendered by the defendants in January 1871. Plaintiff went into possession by his lessees, who worked it until July 4th 1871 ; the canal at that time came through, flooding both mines so that no survey of the working of the mines could be made.

The agent wrote again to the president of defendants as follows :—

"Philadelphia, Dec. 23d 1871.

Mr. J. H. Swoyer, Prest. Wyoming Coal & Trans. Co., Wilkesbarre, Pa.

Dear Sir : We have received from Mr. R. P. Rothwell, mining engineer of Wilkesbarre, a plan of the workings and calculations of the coal taken by you from the property of Mr. Eli K. Price. The amt. fixed by Mr. Rothwell is, say     .     . 22,217 tons.

The amounts returned to us, and for which you paid us 35c. pr. ton, were as follows :—

| May 12th 1870. | Mined to Oct. 22d 1869, | 3829 |
| July 12th. | Mined in June 1870, | 460 |
| Oct. 10th. | July, Aug. and Sept. 1870, | 510 |
| Jan. 19th 1871. | Oct., Nov. and Dec. 1870, | 1618 |

6417 ·

Amt. not paid for,     15,800 less.

31 P. F. Smith—11

| 22,217 tons at 35c. amounts | . | . | . | . | . | $7775.95 |
| 6417 " received by us as above at 35c. pr. ton, | . | | | | | 2245.95 |
| | | | | | | $5530.00 |

Please let us have check for the above, and oblige."

For the above balance the suit was brought, the most important question being whether the plaintiff was entitled to recover for the coal mined under the canal.

The foregoing facts appeared on the trial, February 2d 1874, before Briggs, J.; the deed from Hancock to the plaintiff having been received under objection by the defendants and exception—

For the plaintiff, J. S. Price testified further : that the receipts for the money were not receipts in full, because he had always expected a formal survey would be made as soon as defendants got through. After the end of the year 1870, the plaintiff directed Mr. Rothwell, a mining engineer, to make a survey of the land. The defendants cut across the line of the Burroughs survey through a part of the canal. The break through the canal was about six months after the defendants gave up possession. In April 1871 a lease was made to Burroughs of plaintiff's tracts ; he took possession. Before anything else, the first direction then was to measure.

Rothwell, the civil engineer, testified : that he made surveys of the property at different times from 1866 to 1871 : he made surveys for defendants and for Burroughs : he made surveys in the Burroughs colliery as it approached the Price tract to ascertain whether they went into the Price tract, from January 12th on several days up to May 27th 1871 ; the surveys were made without distinction as to the two tracts ; they ran through the colliery ; on the Price land just as on the Burroughs tract ; in passing through the chambers they could not tell on which they were.

Ogden Haight testified : that a map shown was a map made by him of the survey of the colliery as assistant of Rothwell, in 1871, memoranda in a book shown him were of surveys actually made ; he said the surveys of the Price tract were in connection with the Burroughs colliery ; they were commenced January 12th and ended February 6th 1871 ; he ascertained from the line of the tracts on the surface where the line was under ground ; from the starting point he measured from point to point through the gangway, and took at intervals sights of the different chambers, measuring their widths by taking offsets at different times, to the sides of the chambers and so in the gangways, and went through all the workings in that way : he measured the height of the chambers and also took a number of sections of the coal seam and the seams of slate which occurred ; the height taken by him was the average height. Witness stated in much detail his process of measurement, the

average height, the thickness of coal, size of pillars, &c., that from his measurements he made a calculation which showed that the quantity of coal taken out of the plaintiff's tract was 22,216.8 tons; he ascertained this by dividing the area worked into triangles, multiplying their area by the thickness of the coal which gave the cubical contents and estimating a cubic yard to weigh a ton; having taken off the "pillarage and waste," which he estimated at one-third, before he made the calculation; one-third was the usual deduction allowed in mining.

On cross-examination witness said that he supposed the survey had been made for Burroughs; his instructions were to make a survey of the mine so as to be able to make an accurate plot of the workings and measure the size of some of the pillars and to note the faults; 6417 tons (the amount for which defendants made returns), would not include all the coal taken out of the Price tract; his measurements were almost exclusively taken by a stepping and chaining.

Rothwell testified that the survey and measurements of the opening in the Price property, were made under instructions from Burroughs to ascertain the extent of the workings and condition of the mine, whether it was safe and how much was taken out; the instructions included both collieries; this was just after the defendants had given up their lease and Burroughs was in possession; just after January 1871. Witness verified Haight's calculations and calculated from maps made under his own direction; from the calculations covering ground worked up to January, not including some old workings, witness made the total result 19,287.9 tons; he did not include some workings made after this; both the old and late workings were included in Haight's survey; they amounted together to 2928.9 tons, which would make the total the same as Haight's; from what he saw 6417 tons would not be a fair return of the coal which he saw worked out of the Price tract; 19,287.9 tons he considered a fair return; there was not sufficient pillarage left for safety. There was other evidence of the same general character as to the accuracy and purpose of the measurements, the quantity of coal taken, the damage done by defendants in mining, &c.

For the defendants, John M. Crane, their secretary and treasurer, testified that they first received notice from the plaintiff of the demand for the balance of coal alleged to be unpaid for, in the latter part of December 1871; it was the duty of witness to return to plaintiff the amount of coal mined on his tract; the last return was made in January 1871 for the preceding three months; a check for the amount, $566.28, was sent at the time; no objection was made to the return; the defendants went out of possession January 1st 1871; no objection was made to any return before the canal was flooded; the mine was at all times open to the plaintiff;

the first return was made by defendants' engineer; the balance of the coal was mined from day to day and returned to the office and regularly entered in the books; the amount of coal was taken when it came out of the breaker for shipments for the trade; these were made regularly for 1870 and never objected to.   The manner of doing business is,—the returns are first made to the office by the miner, the gross shipments of coal taken at the end of the month, into this the number of mine cars mined within that month is divided, which is divided into the total shipments; the average weight per car is thereby ascertained and the total weight of the coal arrived at; the miners are paid so·much per ton by weight, before it has gone through the breaker.   The defendants were taking coal from the Burroughs property all the time they were taking coal from the Price property; there was a mine boss employed by defendants to take an account of the coal as it was mined.   To distinguish between the coal mined from the Burroughs and Price properties, the chambers or breasts were numbered, and as each car came, the number of the breast it came from was attached to it and credit given to that car, which went to the account of the man working it; in that way it was ascertained exactly what portion of the mine it came from, and as it came to the breaker account was taken of the coal coming from particular chambers; witness had no books showing the returns of the cars; they might have been at the office in Wilkesbarre, or probably not in existence, as they were something that it was not thought worth while to preserve; they were generally kept for some time; no separate account was kept in the defendant's regular books of the coal taken from the mines respectively; that was kept in the monthly books, the auxiliary books at the time.

The defendants gave much evidence for the purpose of showing that the mode of surveying testified to by plaintiff's witnesses was not reliable; that the amount of coal mined could not thus be accurately ascertained, &c.; and generally in answer to plaintiff's case.   There were also maps, letters, drafts, &c., given in evidence.

The various Acts of Assembly in relation to the construction of the public improvements by means of canals, &c., are referred to in the opinion of the Supreme Court in this case.

One of them, the Act of February 26th 1826 (Pamph. L. 55), authorized the location and contracting for of a canal, called the Pennsylvania Canal, from the river Swatara, near Middletown, westward, to connect the improvements with Pittsburg, &c.; it provided that the canal commissioners might agree with the owners of lands through which the canal was to pass, "for the purchase, use and occupation thereof," on behalf of the Commonwealth; or, if such agreement could not be made, it directed a mode for the valuation by inquisition, &c., and upon the confirmation of the inquisition and payment of the valuation the

state should " be seised of such lands as of an absolute estate in perpetuity, or with such less quantity and duration of interest or estate in the same, or subject to such partial or temporary appropriation, use or occupation" as should be required and described in the inquisition, * * * " as if conveyed by the owners."

Another was an act entitled " An Act to provide for the further extension of the Pennsylvania Canal," passed April 9th 1827 (Pamph. L. 192).    By this the canal commissioners were authorized—amongst other improvements—to provide for the construction of the North Branch Canal ; the act provided also for the assessment and payment of damages for constructing the canal through any person's land, &c. ; for the purchase of property injured by the canal, and to agree with the owner of land through which the canal might pass "for the purchase, use and occupation thereof on behalf of the state."

The plaintiff's fourth point which was affirmed was :—

" The location and construction of the canal through the plaintiff's land will not prevent his recovering in this action for the coal mined and removed by the defendants from his land lying under the canal bed."

The following are points of defendants ; they were all refused :—

3. The title to the coal lying beneath the canal bed is not vested in the plaintiff by the deed from James Hancock to plaintiff, of August 8th 1848.

4. If the jury believe that it was not the intention of the parties to the deed of Hancock to plaintiff to convey the coal under the canal bed, then no title to that part of the coal passed to the plaintiff, and he cannot recover for the same.

6. It was the duty of the plaintiff to have notified the defendants, within a reasonable time after their surrender of the mine to them, the plaintiffs, of any claim for coal alleged to be mined and unpaid for.

The court charged : * * *

" By way of suggestion, merely, not to control you, because you may adopt any mode you please, that is within the limits of the testimony, by which to make a calculation, it may not be improper for me to say : First. Ascertain from the evidence, as nearly as you can, the number of tons taken from Mr. Price's mine by these defendants, from the time they crossed the line of his property, until they ceased mining, that will give you the aggregate ; then take from that aggregate the amount of coal that these defendants returned to Mr. J. Sergeant Price, who is acting for his father, and the balance, if there be a balance, will show the amount for which Mr. Price, the plaintiff, is entitled to a verdict.    If, when you compare the aggregate taken from the mines with the aggregate for which the returns have been made, the one equals the other—that is, if the return would equal the other, Mr. Price would be entitled to nothing.

1. ["That is fairly to restate the account between them, just as if they had sent no statement at all.] I merely suggest that as a mode; you may adopt any mode you see fit. The burthen of proving that more coal was received by the defendants from plaintiff's land than they have accounted for, is cast upon the plaintiff, Mr. Price. * * *

"The receipts given by Mr. J. Sergeant Price, the son and agent of his father, if given in full, and were meant to be in full, of all transactions had between the parties, with a knowledge that a fair and full statement had been rendered of everything, would raise a presumption which Mr. Price would have to overcome. But a receipt is only one link in the chain of testimony, and although it may allege upon its face that it is in full, yet it may be proven to be otherwise—just exactly as a witness may be disproved, who alleges that he has paid his money in full. Whether it is in full or not in full, is to be ascertained by a comprehensive view of all the testimony in the case that has been received, and if you shall ascertain, after giving the testimony this examination, that it is not in full, then the presumption is overcome, and the receipt is entitled to no such benefit of the presumption that I have referred to.

"Then, again, another view is to be submitted to you with regard to that. I have not seen the statements; I have heard them read; * * * but I have received the impression that certain detailed statements were given, constituting what is termed these returns. If the receipt was given for these returns, then you may consider whether, if they are in full, and I do not remember now whether they are—whether they do not have reference to the returns, and not to the entire demands of the plaintiff. * * * That is, if when the detailed statement came, the receipt was given for the statement, then it might be in full or not in full of the claim. If the statement was ascertained to be erroneous, then the receipt being in conformity to the statement, it does not operate against the party giving the receipt at all. Now let us pass on to the evidence that we have got in this case, with reference to the amount of coal mined from this mine. We have got to contend with a difficulty right at the very outset, that neither of these parties could control. It seems they worked, or somebody worked so nearly to the bottom of the canal, or carried the roof of the mine so nearly to the bottom of the canal, that the pressure, or leakage, or moisture, finally percolated through, broke a hole and flooded the mine, whereby it now is a physical impossibility for engineering experts to enter the mine, and to make a calculation with reference to the number of tons taken from the excavations. Not being able to get this, then that which is the next best manner of ascertaining the quantity should be resorted to. Now I would think the next best, and probably the best of all, would be if we could get an account of

[Wyoming Coal and Transportation Co. *v.* Price.]

the quantity of coal for which this company paid miners mining the coal. I say that for this reason, though these miners may not be able to make a mathematical calculation, that inspiring incentive of self-interest impels every one to make a calculation that will not permit his employer to take advantage of him, and what quantity they have been paid for would be evidence of a very high character. It seems so to me, at least, and I submit it with these observations for your consideration, and in doing so, I do not invade your province, which is the absolute disposal of all questions of fact, but it is within my province, and, indeed, it is my duty to call your attention to these considerations, although they may be somewhat critical. Then that character of testimony not being before us, we come down to the surveys.

" It is alleged that this survey was not made for this purpose. Admitting that to be so, and it is a circumstance in the case to be considered, yet if you are of the opinion that it is accurate, then it is just as good as any testimony that could be received. They could produce nothing more, viz., accuracy; that is perfection. It don't matter by which manner of means or mode accuracy is obtained, if obtained by any. It is useless to say other means would have produced the same result, because you have got all that any of the means would produce, viz., accuracy itself. Therefore I say that if the map satisfies you of the quantity of coal, or enables you to reach, or furnishes you data by means of which you may reach, the quantity of coal, then that is evidence for your consideration, and whether it does furnish such data you must determine, in view of all the circumstances in the case, as developed by all the testimony in the case; but it is the only evidence, save the letters, that has been put in here. I do not mean to withdraw any other testimony from you. It seems to me to be the only evidence that we have got before us now. When I say it seems to be so, I am not to be understood as withdrawing your attention from any other piece of testimony. * * * What are those data? During the time I have been upon the bench I have not seen, as it occurs to me, a document so thoroughly criticised, analyzed and inspected, twisted, turned upside-down and inside-out, as this has been. Mr. Darling and Mr. Townsend have certainly exhausted their ingenuity in this respect, and you have got not only the lines and outlines as they are drawn, you have had the field-book, and indeed all the information that could by any possibility be shed upon the question, and the sources from which the information itself was drawn.

" You have heard Mr. Haight. He is a young man, somewhat hesitating in his address, but I want you to understand this, that some men naturally hesitate, other men tell a story with remarkable fluency. Some men are naturally quick-motioned, others are naturally tardy, nevertheless, the tardy men can tell the truth as well as the one who is flippant of speech. You will remember I

[Wyoming Coal and Transportation Co. *v.* Price.]

am not making the application to these witnesses. I say I would be very much disposed to believe the man who well weighs his words, and speaks slowly, more so, than the man who rattles on at a great rate, and sometimes indicating a disregard of truth. I do not make this as a reflection upon any witness. He did make the impression upon my mind that he was a young man of superior intelligence generally, as did also Mr. Rothwell, and as did also the gentlemen who were examined this morning for the defendants— Mr. Hick and Mr. Sternes. All these experts testified, to my mind, with a great deal of clearness. They are witnesses of the highest character of intelligence in their way, and all of them I think must have impressed you so. There is this difference, I ought to say to you, between a witness who does a thing and works it out and produces a plan, and a witness who takes a plan after it is produced, and draws his deduction from it. I would suppose that the man who went over the ground, who entered the mine and took the chain, or the tape in some places, and stepped it in others, that man, it would seem to me, has a facility and an opportunity of acquiring a more accurate knowledge of the locality than the man who takes the product of his labor, and expresses an opinion upon it. However, whether this is so or not is for you. You have heard Mr. Hick's testimony upon it, and he went very elaborately in detail into the question, and gave you his reason for regarding the map as not being reliable on account of the want of means of accuracy. The defendants say it is not accurate. Well, I have no doubt that it fails of that entire accuracy that might be reached under any and all circumstances. But is it substantially accurate? That is the question. Does it to a substantial extent furnish you the data by which you can reach a calculation? If it does then you may consider it. But there is one other point I want to call your attention to. I put this question to you for your consideration; for after all, there is an underlying principle running through every business transaction, by which business men can test almost every circumstance that has a bearing upon a transaction.

2. ["And I submit to you this question, and I think I ought to without at all controlling your judgment, whether this company, after they discovered that they had invaded Mr. Price's tract, and they had made a contract to give him 35 cents per ton royalty, should not have so kept their accounts that it would have appeared upon even casual inspection, exactly the number of tons that came out of his mine.] Now I submit the question to you as business men, and you will test this proposition by business experience. Mr. Price is a resident of the city of Philadelphia; he commits himself in a measure to the business care and keeping of these gentlemen.

3. ["The defendants were honorary trustees to him in rendering the account of the exact amount of coal that was taken from his

[Wyoming Coal and Transportation Co. *v.* Price.]

mine. It is for them to account to him, and not for him to drag out as best he can a detailed statement from them—they have got the facilities, he has not. They should keep their accounts, it seems to me, in such a way that the agent of Mr. Price, or Mr. Price himself, can see at a glance exactly the number of tons that came from his mine. This criticism only applies after they had knowledge that they had crossed Mr. Price's line.]

"Now here is a letter from Swoyer, that would seem to me to indicate that he was to keep a mining account. I will read it. It is the letter closing with the 35 cents per ton royalty contract.

"'I will agree to pay you 35 cents a ton mine rent, for all such coal as we may mine from your property between this and the 1st day of January next, but will not agree to mine out any given amount; the coal to be mined in a workmanlike manner,' &c. This is the part I refer to: 'Your agent to have access to the mine accounts for the purpose of satisfying yourselves how much has been mined.' 'Your agent to have access to the mine account!' *Where is the account?* Is it possible that this company, with its treasurer and its secretary, with the thousands and hundreds of thousands of tons of coal that have been mined, has no account of the number of tons that have been shipped from the Burroughs mine, and has no account of the number of tons that were shipped from the Price mine?

"I call attention to this; you are to pass upon it. I would consider myself derelict if I did not. I do not seek to control you, but look at it in that direction. If they have none, why then, they cannot be produced.

4. ["There has not been the scrape of a pen—a book of any kind—produced here for the inspection of Mr. Price, and yet it is his property they have been handling.]

"I have thus gone somewhat circumstantially and in detail into the law of the case, and I have referred principally to the main points of the testimony in order to shed what light I can upon the question, but after all, the testimony is for you and not for me, and you ought not to be controlled to the weight of a particle of dust by any suggestions that I have made that does not comport with good business judgment, and is not ascertained by the testimony in the case. It would be unfair in me to do so. But I cannot sit here as a figurehead, and shut my eyes and permit that to transpire before me which as a judge I ought to see and which I ought to notice.

"I will answer the points which have been submitted to me by counsel for plaintiff and defendants, which are answered in writing, and are substantially the same as that which I have instructed you in the general observations I have made thus far.

5. ["I will say this, however, in regard to the canal, that Mr. Price owns the land and the coal under the canal, subject to the

right of way of the canal company.] That he who owns land on both sides of the canal owns the fee under the canal; that he owns the fee subject to the surface that has been scooped out of the ditch of the canal; and that too, notwithstanding the boundaries or the limits may be in the deed fixed as on the canal bank or to the tow-path; that is, for canal purposes, and for the right of way, and subject to that he owns under it; and, therefore, taking this deed, and supposing it to show title in Mr. Price, he owns the coal under the canal, and had the right to mine it, and these defendants under their contract from Mr. Price had the right to take it, and were bound to account to him for it; and with regard to his title to it—you may assume, that he has title to it, because the deed shows that he owns the property on both sides of the canal up to it, and these defendants have recognised his right by this agreement; and, therefore, whilst it may not estop them from showing that somebody else owned it, there being no evidence that somebody else did own it, you should assume as a matter of fact that Mr. Price does own it."

The verdict was for the plaintiff for $5338.29.

The defendants took a writ of error; they assigned for error,

1. The admission in evidence of the deed from Hancock to plaintiff.

2. Refusing to submit to the jury the question of intention under the deed from Hancock.

3. The part of the charge in brackets numbered 5.

4. Refusing defendants' 3d point.

5. Affirming plaintiff's 4th point.

6. Refusing defendants' 4th point.

7. Refusing defendants' 6th point.

8. The part of the charge in brackets numbered 1.

9. The part of the charge in brackets numbered 3.

10. The part of the charge in brackets numbered 2.

11. The part of the charge in brackets numbered 4.

12. Because the judge erred in his entire charge in that he nowhere instructed the jury that any obligation rested upon the plaintiff to make a proper survey of the mine for the purpose of computing the coal mined, but, on the other hand, instructed them that it was to be expected that defendants would have made such survey, although they were then out of possession and without notice of any claim.

*S. S. Hollingsworth* and *J. V. Darling*, for plaintiffs in error. —The canal bed and the coal under it were owned by the state in fee simple, and the conveyance from Hancock could give no title to it, because Hancock had no title to give. Long before the inception of his title, the Commonwealth had become "seised of such lands as of an absolute estate in perpetuity," and had erected

thereon the Pennsylvania canal. As early as 1830, the Pennsylvania canal was in process of building on both branches of the Susquehanna river: Commonwealth v. Fisher, 1 Penna. R. 462; under the Acts of February 26th 1826 (Pamph. L. 55), April 10th 1826 (Pamph. L. 331), and March 24th 1828 (Pamph. L. 221). The case of the Commonwealth v. McAllister, 2 Watts 190, established the doctrine that while, as a general rule, the making of a public way does not divest the title of the land owned, " it is different as to the land used by the state in the construction of the canal. The right of property in the land upon which the canal is made becomes vested by the operation of the Act of 1826, according to its express terms, in the state, so that the owner loses all his former right to it." Land acquired under this act by the Commonwealth is held in fee, and on cessation of use does *not* revert to owner: Haldeman v. Pennsylvania Railroad Co., 14 Wright 425. Even where the grant is for the purposes of a canal and the canal is abandoned there is no reversion: Craig v. Mayor of Allegheny, 3 P. F. Smith 477; Robinson v. The Pennsylvania Railroad Co., 22 Id. 316.

*B. P. Wilson* and *J. B. Townsend*, for defendant in error.— Such a taking as in this case, if it pass a fee, must pass a fee for the uses and purposes of the taking. It cannot be for any private purpose: Cooley Const. Lim. 530, 544 *et seq.*; Varick v. Smith, 9 Paige Ch. 561; Story Const., § 1956, p. 673. The appropriation was not for any other purpose than the maintenance of the canal. Separate estates, and both in fee simple, may subsist in different parties, both in the land and in the coal seams under the land: Caldwell v. Fulton, 7 Casey 475; Benson v. Miners' Bank, 8 Harris 370; Searle v. Railroad Co., 9 Casey 57. The appropriation was not a fee allowing alienation to third parties for private uses, but a fee consistent wholly with the objects and purposes of the appropriation, *i. e.*, for the construction and maintenance thereon of the water highway. This is a qualified fee: 2 Bl. Com. 109; Walsingham's Case, Plowd. 557. The state itself, though clothed with the fee, holds it with the constitutional qualification, and is a trustee for the public use, and when this use ends, no power exists to divert property taken *in invitum* from its original owner for such public use to a foreign purpose or private gain: Jessup v. Loucks, 5 P. F. Smith 351; Lance's Appeal, Id. 16. The exercise of this right by the state or its authorized grantee is necessarily in derogation of private right and must be strictly construed: Dwarris on Statutes 750. The company mined and got coal out under Mr. Price's lease to them and as his tenants, paying rent. They cannot dispute his right or title, or his right to the agreed rent upon which they were let into possession: Cooper v. Smith, 8 Watts 536;

[Wyoming Coal and Transportation Co. *v.* Price.]

Boyer *v.* Smith, 5 Id. 64; Porter *v.* Mayfield, 9 Harris 263; Howard *v.* Murphy, 11 Id. 173; Naglee *v.* Ingersoll, 7 Barr 185.

Mr. Justice MERCUR delivered the opinion of the court, May 8th 1876.

The first six errors assigned will be considered together. They involve the question whether the defendant in error owned the land and coal under the canal. If the question was a new one, untrammelled by previous decisions, I should feel disposed to answer it in the affirmative. If, however, the authorities have settled it otherwise, we must assent to them as the true exposition of the law. A reference to the legislation leading to the construction of the Pennsylvania canals, will show that they were all parts of one general system, designed at the commencement.

By the Act of 27th March 1824, Pamph. L. 92, the governor was authorized and required to appoint three commissioners, whose duty it was, to view and explore routes for a canal in various parts of the state, and make report to the governor, to be laid before the next legislature to enable it "to act with a full knowledge of all the necessary facts."

The preamble to the Act of 11th April 1825, Pamph. L. 238, recites, "whereas the establishment of a communication between the eastern and western waters of this state, and the lakes, by means of navigable streams and canals, would advance our agriculture, commerce and manufactories; would unite in a common interest the great natural divisions of the state, and would in the end be an important source of revenue to the Commonwealth. And whereas the best interests of the state require that this great and important improvement should be the property of the Commonwealth, and that the Commonwealth ought to embark in it with that zeal and energy that is best calculated to carry it into effect," therefore the governor was thereby required to appoint five canal commissioners, with a view of their ascertaining the most feasible routes for the construction of a canal. Section third declared "that the routes to be examined by virtue of this act shall be one from Philadelphia, through Chester and Lancaster counties, and thence by the west bank of the Susquehanna, and the waters thereof, to the Allegheny and Pittsburg; also, from the Allegheny to Lake Erie; one other from the city of Philadelphia to the northern boundary of the state towards the Seneca or Cayuga Lake; one other through Cumberland and Franklin counties to the Potomac river; and one by the Conococheague or Monocacy and Conewago to the Susquehanna;" and also "through the county of Bedford to connect the route of the proposed Chesapeake and Ohio Canal with the Juniata route as aforesaid."

Section fourth made it their duty to cause the grounds and streams which might "lie on or contiguous to the probable courses

and ranges of said canal;" "to be explored and examined for the purpose of fixing the most eligible and proper routes for the same, and to cause all necessary surveys, and levels to be taken, and accurate field notes, drafts, and maps thereof, to be made."

The Act of 26th February 1826, Pamph. L. 55, is entitled "An Act to provide for the commencement of a canal to be constructed at the expense of the state, and to be styled the Pennsylvania canal." It authorized the canal commissioners "immediately to locate and contract for making a canal and locks and other works necessary thereto, from the river Swatara, at or near Middletown, to, or near to, a point on the east side of the river Susquehanna, opposite to the mouth of the river Juniata; and from Pittsburg to the mouth of the Kiskeminetas." Section eight authorized the commissioners to agree with the owners of any land through which the canal was intended to pass, "for the purchase, use and occupation thereof," and in case of disagreement or legal disability of the owner, it prescribed a mode of ascertaining the damages. It further declared that "on the payment thereof the state shall be seised of such lands as of an absolute estate in perpetuity, or with such less quantity and duration of interest or estate in the same, or subject to such partial or temporary appropriation, use or occupation, as shall be required and described as aforesaid, as if conveyed by the owner or owners."

The Act of 9th April 1827, Pamph. L. 192, is entitled "An Act to provide for the further extension of the Pennsylvania canal." It authorized the canal commissioners to locate and contract for the construction of a canal up the valley of the Juniata, from the eastern section of the Pennsylvania canal to a point at or near Lewistown; also up the valley of the Kiskeminetas and the Conemaugh, from the western section of the Pennsylvania canal to a point at or near Blairsville, and also "up the valley of the Susquehanna, from the said eastern section of the Pennsylvania canal to a point at or near Northumberland." It further authorized the making of numerous examinations and surveys, and the taking of levels in various parts of the state, including one "from Northumberland up the north branch of the Susquehanna to the state line."

By the Act of 24th March 1828, Pamph. L. 221, the canal commissioners were authorized and required "to locate and contract for making canals from the commencement of the Pennsylvania canal, at or near the mouth of the river Swatara, to Columbia, in Lancaster county; from Lewistown to the highest point expedient and practicable for a canal on the Juniata; from a point at or near Northumberland to the Bald Eagle, on the west branch; from Northumberland to the New York state line on the north branch; from a point at or near Taylor's Ferry to Easton; and

from Blairsville to the highest point expedient and practicable for a canal on the Conemaugh."

Thus it appears the construction of all parts of the canal was in pursuance of a general system designed at the beginning. It had its inception in 1824, assumed a more specific and comprehensive form in 1825, and in 1826 the actual construction of the canals was authorized to be commenced. At first one link on the Susquehanna, another on the Allegheny, with no connection between them. From time to time as loans were effected, new links were formed and branches extended, until the system was completed in furtherance of the original design. The portion constructed along the north branch of the Susquehanna river was in its inception and construction an integral part of the main canal. The state acquired the same right and title to the land occupied by that portion of the canal as to the land occupied by any other portion.

The mode of assessing damages by the Act of 25th February 1826, was changed by the Acts of 9th April 1827, and of 6th April 1830, Pamph. L. 218, but neither of them professed to change the title which the Commonwealth acquired to the land. All the acts were part of the same system. They dealt with the same general subject-matter. They are in *pari materiâ*. They should therefore be construed in connection with each other: Commonwealth *v.* Fisher *et al.*, 1 Penna. R. 462; Commonwealth *v.* McAllister, 2 Watts 190. This last case arose on the application of claimants for damages. The distinction between *perpetual* and *temporary* use, contemplated by the Act of 1826, received a careful consideration. It was there substantially held that temporary, was designed to apply to the use or possession of that larger portion of land which might be occupied during the construction of the canal, while perpetual, was restricted to that portion which was permanently occupied by it after its completion.

Haldeman *v.* Pennsylvania Railroad Co., 14 Wright 425, rested on a different state of facts. The land had been taken under the Acts of 1826 and 1827, for the Pennsylvania canal. The damages sustained by the then owners of the land were duly assessed in 1828 and paid. The canal was constructed on the land and used till 1857. Then, under an act of the legislature, the canal commissioners were authorized to change, and did change, the location of the canal at that point. The old bed of the canal was filled up. The defendant in error, under the Act of 16th May 1857, purchased all that portion of the canal thus filled, and its appurtenances. On the old bed of the canal thus raised up, the railroad company erected shops and buildings. The land had wholly ceased to be used for the purpose for which it had been taken. Haldeman had acquired the title of the person who owned the land when possession was taken for the canal, and whose damages were assessed. He brought ejectment to recover possession. Thus the question directly arose,

what title did the state acquire when she took the land for the purpose of constructing a canal thereon ? This court fully adopted the correctness of the decision in Commonwealth v. McAllister, *supra*, in holding that the title was thereby vested in the Commonwealth in perpetuity ; that being so vested, a subsequent change of its use, and the occupancy of it for other purposes, did not impair the title of the Commonwealth, or of her vendee ; that it was unlike a public road where the fee remained in the owner, but under the acts relating to the canal the state acquired title. Whether it was acquired by purchase and a deed from the vendor, or whether the state took it by virtue of her right of eminent domain, it mattered not. It therefore followed that a cessation of the use for which it was taken could not revest anything in the former owner.

The title which the Commonwealth acquired was again considered in Craig v. Mayor of Allegheny et al., 3 P. F. Smith 477. There the owner of the land had released his damages in consideration of the benefits which would result to the community in general, and him in particular, from the construction of the canal. As in Haldeman v. Pennsylvania Railroad Co., the canal had been constructed and used as such on this land for many years, had been sold by the Commonwealth in 1857, and had ceased to be used as a canal. The conclusion that the Commonwealth had acquired an estate in perpetuity in the land was again affirmed. It was said that the expenditure made by the state in the construction of the canal was equivalent to a pecuniary compensation to the grantor. Being an absolute and perpetual estate in the land occupied by the canal, the estate was neither revocable nor reversionary.

The same question was again discussed in Robinson v. The West Pennsylvania Railroad Co., 22 P. F. Smith 316. This was also a case of release of damages. After many years' use, the ground had been abandoned as a canal and basin. The conclusion that the Commonwealth took an absolute estate in perpetuity was reaffirmed. It was further said, the absolute estate of the Commonwealth would not be defeated or impaired by the owner's neglect or refusal to make application for his damages within the time limited by the act.

The case of Union Canal Co. v. Young, 1 Whart. 410, also shows that when land is procured for the building of a canal thereon, the presumption is that the right of soil is acquired, and not a mere easement thereon.

It must, therefore, now be declared as the settled law of this state, that whenever the Commonwealth took land for permanent use under the acts in question, and constructed and operated a canal thereon, she acquired an estate in the lands so taken in perpetuity, and she may dispose of the same in fee.

It is contended further by the defendant in error, that inasmuch

as a tenant cannot dispute the title of his landlord, under whom he entered, held possession, and enjoyed the profits, without any disturbance, under a paramount title, therefore, it is not admissible to prove that the defendant in error had no title to the coal under the canal. The law between landlord and tenant may be conceded as claimed, yet the conclusion by no means follows. There was no contract creating a tenancy of lands by any certain or defined limits or bounds, nor was there any putting into possession by any designated or described lines or muniments. Possession of a part of the mines at first inadvertently taken on the lands of the defendant in error was merely continued under an agreement for the payment of royalty, for the coal that might be mined within a specified time. The defendant owned two separate and distinct pieces of land. Lying between them was the strip which he did not own, and of which he had no possession. There is no evidence indicating an intention to put the company into possession of land that he did not own. There is, therefore, no warrant for the assumption that the relation of landlord and tenant existed as to the land under the canal. Hence it follows that the question covered by the second assignment is irrelevant, and the other five assignments are sustained.

The 7th assignment is that the court instructed the jury "fairly to restate the account between them, just as if they had sent no statement at all." Looking at other portions of the charge, we understand the learned judge to mean that if the jury first find the account rendered to be inaccurate and untruthful, then they shall restate as if none had been sent. So understanding it, we see no error in the instruction.

The 9th and 11th assignments may be considered together. The mining operations in question closed on the 1st of January 1871. An account of the quantity of coal mined in June was first rendered. After that quarterly returns were made; the last on the 19th of January 1872. During the whole time the mining operations were in progress no complaint was made as to the time, manner or truthfulness of these reports. Crans, who was both secretary and treasurer of the company, swears that no objection was made until after the mine was flooded in July following. While the work was in progress, the defendant in error was in nowise restrained in free access to the mines and the mining accounts for any investigations he may have desired to make. If he failed to exercise those rights, the conclusion is a reasonable one that he was then satisfied with the accounts rendered. Having then acquiesced in them for so long a time, the presumption is in favor of their accuracy. That presumption may be overthrown by testimony showing them to have been either inaccurately kept or untruthfully returned.

The testimony shows that in conducting the mining operations

[Wyoming Coal and Transportation Co. *v.* Price.]

each chamber or breast was numbered. Each car had a number attached to it, showing the breast from which it came. The credit was given to the car, and to the account of the man working the breast. As the coal came to the breaker, these accounts were taken. These returns were entered on the books, but the evidence further shows that these books were not thought worth preserving for any length of time, and were probably not in existence. If in existence, they were at Wilkesbarre, and no notice had been given to produce them. In view of all the facts, we think the learned judge unduly prejudiced the case in saying that it was not for the defendant in error " to drag out as best he can, a detailed statement from them," and in further saying, " there has not been the scrape of a pen, a book of any kind, produced here for the inspection of Mr. Price." It does not appear that anything asked for, which was in the power of the plaintiff in error to produce, had been withheld.

We discover no substantial error in the remaining assignments.

Judgment reversed, and a *venire facias de novo* awarded.