Dornan *v.* Philadelphia Housing Authority et al.

Argued May 10, 1938.  Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Shippen Lewis,* with him *Israel Packel,* for plaintiff.

*Francis Biddle,* with him *Abraham L. Freedman,* for Philadelphia Housing Authority, defendant.

*Robert von Moschzisker,* for School District of Philadelphia, defendant.

*Joseph Sharfsin,* City Solicitor, with him *Howard E. Stern,* Assistant City Solicitor, for City of Philadelphia, defendant.

*J. Alfred Wilner,* for Pittsburgh Housing Authority, intervenor.

*Julius M. Rapoport,* for Allentown Housing Authority, intervenor.

*Guy K. Bard,* Attorney General, *Oliver C. Cohen,* Deputy Attorney General, and *Sidney Schulman,* for State Board of Housing, intervenors.

*Churchill Mehard,* City Solicitor, and *Anne X. Alpern,* First Assistant City Solicitor, for City of Pittsburgh, intervenor.

*Charles Abrams* and *Elliott F. Glassberg,* for amicus curiæ.

OPINION BY MR. JUSTICE STERN, June 30, 1938:

This is a taxpayer's bill in equity, of which this court has assumed original jurisdiction, to test the constitutionality of two acts of Assembly, the one, that of May 26, 1937, P. L. 888, known as the "Housing Coöperation Law," and the other, that of May 28, 1937, P. L. 955, known as the "Housing Authorities Law." In order fully to understand the purport of these statutes, which are more or less similar to acts passed in thirty-one other states, they should be read in connection with the "State Board of Housing Law" of June 5, 1937, P. L. 1705, and the Act of Congress of September 1, 1937, known as the "United States Housing Act of 1937," 50 Stat. 888, 42 U. S. C. A., sec. 1401 et seq. They are designed to accomplish, or at least facilitate, through the instrumentality of public agencies, the elimination in Pennsylvania of unsafe, unsanitary, inadequate and

overcrowded dwellings, and to substitute in their stead decent habitations for persons heretofore compelled to live in slum areas.[1]

A legislative project of this nature goes beyond anything heretofore attempted in this State. It naturally invites, therefore, the attack of those who are inclined to regard all experiments in our social and economic life as presumptively unconstitutional. Such challenges must fail, however, if, upon analysis, it appears that the only novelty in the legislation is that approved principles are applied to new conditions. Neither our State nor our federal constitution forbids changes, merely because they are such, in the nature or the manner of use of methods designed to enhance the public welfare; they require only that the new weapons employed to combat ancient evils shall be consistent with the fundamental scheme of government of the Commonwealth and the nation, and shall not violate specific constitutional mandates.

Before discussing the legal problems here involved it is necessary briefly to summarize the provisions of this legislation. The Housing Authorities Law makes the factual declaration that there exist in communities throughout the Commonwealth numerous slums, together with an acute shortage of safe and sanitary dwellings within the financial reach of persons of low income, and that these conditions encourage the spread of disease, impair public health and morals, increase the hazards of fires and accidents, subject the moral standards of the people to bad influences, and increase the violation of the criminal laws. It states that, because of the prevailing stagnation of business activity, private industry is unable to cope with this situation. The

---

[1] A "slum" is defined in the Housing Authorities Law as "Any area in which there is a predominance of structures which, by reason of dilapidation, overcrowding, faulty arrangement or design, lack of ventilation, light or sanitary facilities, or any combination of these factors, are detrimental to safety, health, and morals."

act therefore provides for the creation of "corporate and politic bodies" to be known as "Housing Authorities," which shall operate for the clearance, replanning, and reconstruction of the areas in which slums exist, and the providing of safe and sanitary dwelling accommodations for persons of low income.[2] Such purposes are declared by the act to be "public uses for which public money may be spent, and private property acquired by the exercise of the power of eminent domain." The Authorities are to come into existence in and for any city or county when the governing body thereof declares by resolution that there is need for such an Authority.[3] An Authority "shall in no way be deemed to be an instrumentality of such city or county, or engaged in the performance of a municipal function." The members of an Authority, five in number, are to be appointed by various public officials as specified in the act. Each Authority is to "constitute a public body . . . exercising public powers of the Commonwealth as an agency thereof." Among these powers are enumerated the following: To investigate into housing conditions and the means and methods of improving them; to study and make recommendations concerning city planning with reference to the housing problem; to acquire, construct, improve and operate housing projects; to co-operate with municipalities and with federal agencies in order to effectuate the purposes of the act; to clear areas of unsafe or unsanitary housing, and to provide for the use of cleared sites for community facilities and for any other public purpose authorized by the act; to rent any of the dwellings and accommodations embraced in any housing project, and to establish and revise the rents or charges therefor; to acquire any real or personal prop-

---

[2] "Persons of low income" are defined in the act as persons or families whose aggregate annual income shall not exceed six times the annual rental of the quarters to be furnished them.

[3] On certain prescribed conditions the Governor may, by certificate, create an Authority for a city or county.

erty by gift or purchase from any person, corporation, municipality or government; to acquire by eminent domain any real property "for the public purposes" set forth in the act; to sell or assign any property when the Authority determines that it is not needed for the purposes of the act. It is specified that the projects are not to be constructed or operated for profit; therefore, the Authority is to fix rentals for dwellings in its projects at no higher rates than necessary to produce revenues sufficient to pay the principal and interest of its bonds and to provide for the cost of maintaining and operating the projects and for the administrative expenses of the Authority. It may rent dwelling accommodations only to persons of low income as defined in the act. Title to any property acquired by an Authority through eminent domain shall be an absolute or fee simple title, unless a lesser title shall be designated in the proceedings. An Authority may issue bonds for any of its corporate purposes, but such bonds or other obligations of the Authority "shall not be a debt of any city, county, municipal subdivision or of the Commonwealth, . . . nor shall any city, county, municipal subdivision or the Commonwealth, nor any revenues or any property of any city, county, municipal subdivision or of the Commonwealth be liable therefor." To secure its bonds an Authority may pledge its revenues and mortgage its housing projects or other property. It is empowered to borrow money or accept grants or other financial assistance from the federal government in aid of any housing project within its area of operation. The property of an Authority is "declared to be public property used for essential public and governmental purposes and such property and an Authority shall be exempt from all taxes and special assessments, except school taxes, of the city, the county, the Commonwealth, or any political subdivision thereof." In lieu of such taxes or special assessments, an Authority may agree to make payments to the city or the county, or any such political subdi-

vision, for improvements, services and facilities rendered for the benefit of a housing project or its tenants, but not exceeding their estimated cost.

The Housing Coöperation Law provides that, for the purpose of aiding and coöperating in the construction or operation of housing projects, any State public body[4] may, upon such terms as it shall determine, with or without consideration, dedicate, sell or lease any of its property to a Housing Authority, furnish playgrounds and recreational facilities, and provide and pave streets and roads, for the benefit of the Authority's housing projects. It is further provided that when any Authority becomes authorized to transact business and exercise its powers, the city council or the county commissioners, as the case may be, may appropriate to the Authority an amount of money necessary for its administrative expenses and overhead during the first year thereafter, to be paid to the Authority as a donation, and any city, borough, town or county, located in whole or in part within the field of operation of a Housing Authority, shall have the power, from time to time, to lend or donate money to it.

In the determination of one fundamental question will be found also the answer to the more important of the specific objections raised by plaintiff to the constitutionality of this legislation. Does the use to which the property acquired by the Housing Authorities will be devoted constitute a *"public* use" within the legal definition of that term? It is plaintiff's contention that the buildings to be erected by the Housing Authorities will not be used by the general public but only by a comparatively few persons of a class limited to those of low income, and, while conceding that the construction and

---

[4] The act defines "State Public Body" as "any city, borough, town, township, county, municipal corporation, commission, district authority, other subdivision or public body of this Commonwealth."

renting of the new dwellings to such persons may constitute a public *benefit,* plaintiff maintains that their *use* will not be a public one, and that, therefore, the land upon which they are to be erected cannot be acquired under the power of eminent domain, without which power, it is conceded by defendant Housing Authority, it will be impossible to make the legislation practically operative.

Scattered here and there throughout the decisions of the courts of various jurisdictions are suggestions of a distinction, in regard to the right of eminent domain, between the taking of property for a public use and the taking of it for a public benefit. In Nichols on Eminent Domain, 2d ed., vol. 1, sec. 40, pp. 129, 130, 131, it is said: "The disagreement over the meaning of 'public use' is based largely upon the question of the sense in which the word 'use' in the constitution was intended to be understood, and has developed two opposing views, each of which has its ardent supporters among the text writers and courts of last resort. The supporters of one school insist that 'public use' means 'use by the public,' that is, public service or employment, and that consequently to make a use public a duty must devolve upon the person or corporation seeking to take property by right of eminent domain to furnish the public with the use intended, and the public must be entitled, as of right, to use or enjoy the property taken. . . . On the other hand, the courts that are inclined to go furthest in sustaining public rights at the expense of property rights contend that 'public use' means 'public advantage,' and that anything which tends to enlarge the resources, increase the industrial energies, and promote the productive power of any considerable number of the inhabitants of a section of the state, or which leads to the growth of towns and the creation of new resources for the employment of capital and labor, manifestly contributes to the general welfare and the prosperity of the whole community, and, giving the constitution a broad

and comprehensive interpretation, constitutes a public use."

It would be quite difficult to determine the exact point at which the courts of our own State have taken their position in this controversy. The leading case adhering to the stricter conception of public use is *Pennsylvania Mutual Life Insurance Co. v. Philadelphia,* 242 Pa. 47. There, an act was held unconstitutional which authorized cities to appropriate private property adjoining parkways, and to resell it subject to building restrictions intended to insure the erection of abutting buildings of a satisfactory size and type. The court held that the property thus taken would not be for a public use. After saying (p. 53) that "There is no constitutional or statutory definition of the words 'public use,' and none of the adjudicated cases has given a definition of the words which can have universal application," the court proceeded (p. 55) to adopt and apply the doctrine that "to constitute a public use for which private property may be appropriated there must be a use or right of use by the public," and, since the property was not to be retained by the public, but was to be taken only for immediate resale for private use, the appropriation was not for a public use justifying the exercise of the right of eminent domain.[5] In *Waddell's Appeal,* 84 Pa. 90, an act giving to persons owning anthracite coal in lands on both sides of any river a right of way across the river from their lands on one side to those on the other, either upon or under the surface, for the purpose of mining and removing their coal, upon paying the owner of the land passed over or under, was held to be unconstitutional as involving the taking of private property for a private, as distinguished from a public, use.[6] In

---

[5] The object sought by the act in that case could have been, and frequently since has been, accomplished by the enactment, under the police power of the State, of zoning ordinances.

[6] See also *Philadelphia Clay Co. v. York Clay Co.,* 241 Pa. 305, and *Poland Coal Company's Case,* 58 Pa. Superior Ct. 312.

*Twelfth-Street Market Company v. Philadelphia & Reading Terminal R. R. Co.,* 142 Pa. 580, it was held that maintaining and operating a market house and renting out the stalls to tenants was a private business, and did not constitute a public use of the property. In the opinion of the court below, affirmed by this court, it was said (pp. 586, 587) : "The test whether a use is public or not is whether a public trust is imposed upon the property, whether the public has a legal right to the use, which cannot be gainsaid, or denied, or withdrawn, at the pleasure of the owner. A particular enterprise, palpably for private advantage, will not become a public use because of the theoretical right of the public to use it. The question is, whether the public have a right to the use. . . . The true criterion by which to judge of the character of the use is whether the public may enjoy it by right, or only by permission. . . . To constitute a public use, the property must be under the control of the public, or of public agencies, or the public must have a right to the use." The court admitted (p. 589) that "In a market established, managed, and controlled by the municipal authorities, and governed by municipal laws, there may be no doubt a public use."

On the other hand, there are cases in Pennsylvania which greatly broaden the interpretations thus given to the phrase "public use." In *Jacobs v. Clearview Water Supply Co.,* 220 Pa. 388, it was held that a water company for the supplying of water and water power for commercial and manufacturing purposes functioned for a public use and could properly be invested with the right of eminent domain, notwithstanding the fact that the principal consumer of the water was to be a railroad company, and that very few, if any, persons within the sphere of the company's operations were engaged in commercial or manufacturing enterprises. The court (pp. 393, 394) quoted with approval a statement from Mills on Eminent Domain, section 12, that: "If the proposed improvement tends to enlarge the resources,

increase the industrial energies, and promote the productive power of any considerable number of the community, the use is public." So, in *Pioneer Coal Co. v. Cherrytree & Dixonville R. R. Co.,* 272 Pa. 43, in holding that the defendant company could build an extension of a branch road which the plaintiff contended was a mere spur or siding facility for the private use and benefit of a competing coal company, the court said (pp. 52, 53) : "What constitutes public use is a point not free from difficulties, but wherever it appears from the attending circumstances that a section of road about to be constructed will in some direct way tend to contribute to the general public welfare, or the welfare of a considerable element of the public, it cannot be said that it will not serve a public use; this principle is now too well established in Pennsylvania to be questioned: [citing cases] . . . Here, . . . since it must . . . be conceded that the life, happiness and prosperity of the people of Pennsylvania depend to a very large degree upon getting the coal supply of the State out of the mines, on its way to the consumer, this in itself, on the facts at bar, stamps a project like that before us as one for public use, sufficiently to justify the exercise of the right of eminent domain."[7] In *Wentz v. Philadelphia,* 301 Pa. 261, it was held that the city might acquire by condemnation land for the purpose of establishing and maintaining municipal airdromes or aviation landing fields.[8]

---

[7] See also *C. O. Struse & Sons Co. v. Reading Co.,* 302 Pa. 211.

[8] The Supreme Court of the United States has been extremely liberal in uniformly holding that where the appropriation of property under the right of eminent domain subserves a large public purpose it is justified as being for a public use: *Fallbrook Irrigation District v. Bradley,* 164 U. S. 112, 160-164; *Mt. Vernon Cotton Co. v. Alabama Power Co.,* 240 U. S. 30. See *Block v. Hirsh,* 256 U. S. 135, 155, for a judicial recognition by that court of the evolutionary change of an industry from a status of private to one of public interest. See also, as to what constitutes a public purpose for which taxes may be levied: *Jones v. City of Portland,* 245 U. S. 217, and *Green v. Frazier,* 253 U. S. 233.

On the whole, although the cases on this subject in Pennsylvania have been comparatively few in number, it may fairly be stated that, while firmly maintaining the principle that private property cannot be taken by government for other than a public use, they justify the conclusion that judicial interpretation of "public use" has not been circumscribed in our State by mere legalistic formulas or philological standards. On the contrary, definition has been left, as indeed it must be, to the varying circumstances and situations which arise, with special reference to the social and economic background of the period in which the particular problem presents itself for consideration. Moreover, views as to what constitutes a public use necessarily vary with changing conceptions of the scope and functions of government, so that to-day there are familiar examples of such use which formerly would not have been so considered. As governmental activities increase with the growing complexity and integration of society, the concept of "public use" naturally expands in proportion.

Some of the factors involved in the proposed operation of the new housing projects which are emphasized by plaintiff as being opposed to the theory of a public use prove, upon analysis, to be of little or no weight in the consideration of that subject. Thus the fact that the dwellings cannot and will not be occupied by all, but only by a few of the public having the prescribed qualification of poverty, is wholly lacking in legal significance, because the same may be said as to jails, poorhouses, and indeed many other institutions which are necessarily confined to a use, voluntary or involuntary, by certain selected portions of the population. An occupancy by some may promote, or even be vital to, the welfare of all. Nor is importance to be ascribed to the circumstance that some persons—the tenants—will from time to time receive more benefit from the use of the dwellings than the general public. The same observation would apply to hospitals and schools. The tak-

ing of land for a public golf course or playground would be for a public use although, while some players are using it, all other members of the public are necessarily excluded from utilizing and enjoying the facilities. The difference in the duration of occupancy in these various instances is one of degree. It is not essential that the entire community or even any considerable portion of it should directly enjoy or participate in an improvement in order to make its use a public one: *Fallbrook Irrigation District v. Bradley*, 164 U. S. 112, 161, 162; *Mt. Vernon Cotton Co. v. Alabama Power Co.*, 240 U. S. 30, 32; *Talbot v. Hudson*, 16 Gray (Mass.) 417, 425. "An enterprise does not lose the character of a public use because that use may be limited by circumstances to a comparatively small part of the public": *Jacobs v. Clearview Water Supply Co.*, 220 Pa. 388, 394. It is to be noted, too, that the Housing Authorities Law declares the purposes of the act to be "public purposes for which public money may be spent and private property acquired by the exercise of the power of eminent domain," and, while such a legislative declaration is not conclusive—it being for the ultimate decision of the courts as to whether a proposed use is a public one—it is entitled not only to respect but to a prima facie acceptance of its correctness: *Block v. Hirsh*, 256 U. S. 135, 154; *Jacobs v. Clearview Water Supply Co.*, 220 Pa. 388, 393; *Philadelphia Clay Co. v. York Clay Co.*, 241 Pa. 305, 310. Furthermore, a stronger presumption arises in favor of the public nature of the use where the taking is by the government itself instead of by a private corporation endowed with the right of eminent domain. While the Housing Authorities are not part of the Government, they are public bodies created and organized solely to promote the general welfare and without any motive or possibility of private profit accruing to anyone, since the rentals are to be fixed at rates no higher than necessary to pay principal and in-

terest on the Authority's bonds and its operating costs and administrative expenses.

In addition to all that has heretofore been said, there is, in the legal situation here presented, a factor which conclusively determines that the use for which these housing projects are designed is a public one, namely, that the construction of the new dwellings as authorized by these statutes is to be an aid to, and indeed a necessary adjunct of, the demolition of dangerous and unsanitary dwellings, which, in turn, is an exercise of the police power of the Commonwealth. The fallacy involved in plaintiff's position is in viewing the right given to the Authorities to take private property by eminent domain in order to provide housing accommodations as though it were an independent and unrelated grant of the power, without regard to the major and primary object of the legislation, which is the eradication of the slums. We are not prepared to say, and are not to be considered as holding, that the Commonwealth or any of its political subdivisions may engage generally in the housing business for supposed public benefit or welfare, although there is authority for the proposition that, unlike the federal government, which is one of restricted powers, the State, or its municipalities if authorized by it, may engage, at least under some circumstances, in certain business enterprises.[9]  Here, how-

---

[9] *Linn v. Chambersburg Borough,* 160 Pa. 511, 521; *Wentz v. Philadelphia,* 301 Pa. 261, 275; *Rohrer v. Milk Control Board,* 322 Pa. 257, 269 (quoting from the opinion of Mr. Justice ROBERTS in *Nebbia v. New York,* 291 U. S. 502; *Commonwealth v. Stofchek,* 322 Pa. 513, 520; *Albritton v. City of Winona,* 181 Miss. 75, 178 So. 799, appeal to the Supreme Court of the United States dismissed for want of a substantial federal question, 58 Sup. Ct. Rep. 766); *Jones v. City of Portland,* 245 U. S. 217; *Green v. Frazier,* 253 U. S. 233. In the last-named case the Supreme Court of the United States upheld as legitimate governmental activities, and as public in purpose, a series of acts that have come to be known as the North Dakota experiment in state socialism. These acts authorized a state industrial commission to engage in many enter-

ever, the construction and the operation of housing projects are merely ancillary to the underlying purpose of slum clearance. The elimination of unsafe and dilapidated tenements is a legitimate object for the exercise of the police power. Apart from the declarations in the Housing Authorities Law itself, the veriest tyro in the study of social conditions knows that the existence of slums is a menace to the health and happiness of the community in which they exist. Not only are they the focal centers of disease, and the likely sources of fires and accidents due to overcrowding, but they exert a pernicious moral influence upon those unfortunate enough to be obliged to live in them, and thereby engender those proclivities of youth to crime which have been characterized by many in high places as a disgrace to our civilization. Physical, as well as spiritual, environment is a potent influence in the development of character. Because of such considerations, our statute books, from the beginning of the Commonwealth to the present time, have been replete with enactments designed to insure the safety and the sanitary condition of dwellings, and individual houses have now and then been condemned as unsafe and been torn down by public authority, while a comparatively recent legislative development has been the passage of acts providing for zoning and building restrictions designed to insure light and air, and thereby health, for people in their homes. All of this has been done by virtue of the police power, which is the greatest and most powerful attribute of government, for upon it the very existence of the State depends. Its relation to the measures provided in the

---

prises, among which were the establishment of a state bank, a state mill and grain elevator program, and housing under a Home Building Act. It is to be noted that the Housing Authorities Law declares, and it must be accepted prima facie as true, that "the construction, pursuant to this act, of housing projects for persons of low income would . . . not be competitive with private enterprise."

Housing Authorities Law is as direct as it is obvious.[10] It appearing that all previous attempts to rid communities of their unsafe and objectionable dwellings have proved ineffective, it is now found necessary to resort to the more drastic and comprehensive method of demolishing such structures simultaneously and over more extended areas. But, as indicated in the Housing Authorities Law—and indeed it is self-evident—this cannot be done and the ultimate aim be achieved unless at the same time provision is made for sanitary and wholesome accommodations for those who will lose their homes in the process. Certainly such persons cannot be left wholly without shelter, yet their financial resources are insufficient to enable them to lease any existing dwellings outside of other slum districts, since private industry has not been able to furnish acceptable accommodations at a rental cost as low as that now paid for rooms in slum properties. For the State or a municipality to tear down objectionable houses without providing better ones in their stead would be merely to force those ejected into other slums or compel them to create new ones, and the cardinal purpose of the legislation would thus be frustrated. As a necessary concomitant of slum elimination, therefore, provision is made in the Housing Authorities Law for the erection, without profit, and through the enjoyment of federal subsidies, of low-cost housing projects in which to shelter the evicted inhabitants of slum areas. True, it cannot be definitely proved that those who live in the tenements to be demolished will be those who, in whole or in part, will occupy the new dwellings, but the legislation is evidently planned to accomplish that result, and whether the object will be attained or not is a matter for the judgment and responsibility of the legislature. That body has the right to

---

[10] The State may, and probably will, supplement the exercise of its police power by taking title to slum areas, when cleared, and converting them into public parks and playgrounds.

make the experiment. Courts determine power, not policy.

What we have here, then, is a situation in which the proposed construction of new housing is vital to the clearance of the slums through the exercise of the police power, but the necessary sites for the housing projects can be justly and practically acquired only by means of the power of eminent domain, and what we now decide is that when the power of eminent domain is thus called into play as a handmaiden to the police power and in order to make its proper exercise effective, it is necessarily for a public use. "The promotion of the public health is undoubtedly a public use within the meaning of the constitution, and private property may be taken for the construction of drains, levees and other works in order to accomplsh this object": Lewis, Eminent Domain, 3d ed., vol. 1, page 569, sec. 286.[11] It is indeed conceivable that, wholly apart from any factor of slum elimination, abnormal social and economic conditions might arise which would cause an acute shortage of houses in a community, that private industry would be impotent to cure the deficiency, that, under such circumstances, the exercise of the police power might be required in order to furnish shelter and thereby prevent epidemics and immoral and crime-breeding conditions of living, and that the utilization of the right of eminent domain would then be justified in order to acquire the necessary land upon which to erect the needed dwellings.[12] However, we need not speculate as to this, be-

---

[11] See *In the Matter of the Application of David R. Ryers et al.,* 72 N. Y. 1, 7.

[12] In Cooley's Constitutional Limitations, 8th ed., vol. 2, p. 1131, it is said that a public use can be considered to exist "where the government is supplying its own needs, or is furnishing facilities for its citizens in regard to those matters of public necessity, convenience, or welfare, which, on account of their peculiar character, and the difficulty—perhaps impossibility—of making provision for them otherwise, it is alike proper, useful and needful for the gov-

cause here the eradication of slum areas by the demolition of objectionable dwellings is the dominant background of the Housing Authorities Law.[13]  Since all other restrictive measures have proved inadequate, it would mean, if plaintiff's viewpoint be correct, that, so far as any remedies now known are concerned, the abolition of slum districts is beyond the present constitutional power of the State.  Such a conclusion should be avoided unless inescapable.  The marked tendency of modern decisions is in aid of city planning and the improvement of housing conditions.  Acts similar to those here under consideration have been held constitutional in *Willmon v. Powell,* 91 Cal. App. 1, 266 Pac. 1029; *New York City Housing Authority v. Muller,* 270 N. Y. 333, 1 N. E. (2d) 153; *Spahn v. Stewart,* 268 Ky. 97, 103 S. W. (2d) 651.

It being thus demonstrated that the use to which the housing projects will be devoted is a public one, it follows that the grant in the Housing Authorities Law of the right of eminent domain does not violate Article I, section 9 of the Declaration of Rights in the Constitution of Pennsylvania, nor the 14th Amendment to the federal Constitution.  Nor can valid objection be made to the permission given the Housing Authorities to acquire, when exercising the power of eminent domain, an absolute or fee simple title, and to sell and convey any property, even if thus acquired, when it determines that it is no longer needed for the purposes of the act: *Halde-*

---

ernment to provide." Mr. Justice HOLMES said in *Block v. Hirsh,* 256 U. S. 135, 156, that "Housing is a necessary of life," and the Housing Authorities Law declares that at present there is a difficulty in adequately furnishing it because of the prevailing stagnation of business activity.

[13] In the two Massachusetts cases relied upon by plaintiff, namely, *In re Opinion of the Justices,* 211 Mass. 624, 98 N. E. 611, and *Salisbury Land & Improvement Co. v. Commonwealth,* 215 Mass. 371, 102 N. E. 619, the statutes did not provide for the clearance of slum areas.

*man v. Pennsylvania R. R. Co.,* 50 Pa. 425, 436, 437;
*Wyoming Coal & Transportation Co. v. Price,* 81 Pa.
156, 174, 175; *Lazarus v. Morris,* 212 Pa. 128, 131;
*Foust v. Dreutlein,* 237 Pa. 108, 112-114.

The public nature of the use of the property also justifies the exemption granted by the act from state and local taxation.[14] Indeed, in the absence of any statute to the contrary, public property used for public purposes is exempt from taxation and from assessments for improvements, and no express exemption law is needed: *Directors of the Poor v. School Directors,* 42 Pa. 21; *County of Erie v. City of Erie,* 113 Pa. 360; *Philadelphia v. Barber,* 160 Pa. 123, 128; *Pittsburg v. Sterrett Subdistrict School,* 204 Pa. 635; *Wilkinsburg Borough v. School District,* 298 Pa. 193, 197, 198; *Commonwealth v. Pure Oil Co.,* 303 Pa. 112, 117, 118. However, there is a succession of statutes, culminating in the General County Assessment Law of May 22, 1933, P. L. 853, section 204(g), which have expressly exempted all public property used for public purposes from local taxation.[15]

It is contended by plaintiff that the provision of the Housing Coöperation Law authorizing local subdivisions of government to lend or donate money to an Authority is a violation of Article IX, section 7 of the Con-

---

[14] The case of *Chadwick v. Maginnes,* 94 Pa. 117, cited by plaintiff, was distinguished in *County of Erie v. Commissioners of Water Works,* 113 Pa. 368, 370, 371, and *Commonwealth v. Philadelphia Rapid Transit Co.,* 287 Pa. 70, 74, on the ground that the property there taxed was not public property but was held for the pecuniary profit of a limited group of taxpayers.

[15] Clause (L) of section 204 of the General County Assessment Law subjects to taxation property not in actual use and occupation for the purposes there specified. The projects under the Housing Authorities Law, however, will be in actual use and occupation for public purposes. That clause also subjects to taxation property from which any income or revenue is derived, but numerous decisions make clear that this does not apply to revenue from the very activities which constitute the public purposes of the institution where there is no element of private profit.

stitution which prohibits the General Assembly from authorizing any county, city, borough, township or incorporated district to appropriate money for, or to loan its credit to, any corporation, association, institution or individual. This raises an important question which need not be passed upon at this time.

Does the Housing Authorities Law violate Article III, section 7 of the Constitution, forbidding special legislation regulating the affairs of counties, cities, townships, wards, boroughs or school districts? Plaintiff's challenge on this point is based upon the provisions in the act that in third-class counties the appointments of members of the Authorities are to be made by the county commissioners and the Governor, in other counties only by the county commissioners, in cities of the first class by the mayor and the city controller, in cities of the third class by the mayor and the Governor, and in all other cities by the mayor alone. However, the method of appointment within each group of cities or counties of the same class is the same, and the objections here raised are unfounded: *Tranter v. Allegheny County Authority,* 316 Pa. 65, 76, 77; *Commonwealth ex rel. Kelley v. Cantrell,* 327 Pa. 369, 379, 380. See also *Commonwealth v. Wert,* 282 Pa. 575, 580, 581; *Retirement Board of Allegheny County v. McGovern,* 316 Pa. 161, 166, 167. The latitude allowed in classification has been broadened by the constitutional amendment of November 6, 1923, now section 34 of Article III, and the provision that the members of the Authorities shall be appointed differently in cities and counties of different classes comes well within the intent and scope of that amendment.

Does the Housing Authorities Law involve any unconstitutional delegation of legislative power? In our opinion it does not. While administrative discretion is necessarily confided to the Authorities with regard to the areas to be cleared, the projects to be constructed, and the tenants to be selected, the standards by which

these various processes are to be controlled are laid down with reasonable exactitude. The act defines the term "persons of low income," and rental charges are confined to the factors of operating costs and carrying charges without any profit item. There is no express prescription of a maximum cost of construction, but by reason of its statement of purposes and its whole organic scheme the act impliedly imposes upon the Authorities the duty of seeing to it that the structures shall be as modest and inexpensive as reasonably possible from a practical standpoint. Moreover, it is well known that the Authorities will not be able to operate without federal assistance, and by the United States Housing Act of 1937, under which such aid is authorized, it is provided that no federal loans, contributions or capital grants shall be made with respect to any project costing more than the amounts therein specified. Any extended discussion as to the permissible limits of delegation of legislative power is unnecessary in view of the comprehensive treatment of that subject in *Gima v. Hudson Coal Co.*, 310 Pa. 480, and *Rohrer v. Milk Control Board*, 322 Pa. 257, 277-279. See also *Tranter v. Allegheny County Authority*, 316 Pa. 65, 76; *Kelley v. Earle*, 325 Pa. 337, 352, 353.

Will the proposed Housing Authorities constitute special commissions within the meaning of Article III, section 20 of the Constitution which prohibits the General Assembly from delegating to such a commission any power to make, supervise or interfere with any municipal improvement, money, property, or effects, or to perform any municipal function whatever? In *Tranter v. Allegheny County Authority*, 316 Pa. 65, 77-79, it was shown that the mandate of this provision of the Constitution was not violated by the creation and operation of Authorities such as those contemplated by the present legislation. See also *Poor District Case (No. 1)*, 329 Pa. 390, 404-406.

Does the act violate Article IX, section 8 of the Constitution creating a debt limit for counties, cities, boroughs, townships, school districts, and other municipalities and incorporated districts, or Article IX, section 10, requiring that provision be made for the collection of an annual tax when any county, township, school district or other municipality incurs any indebtedness, or Article XV, section 2, which forbids the incurring of liability by any municipal commission, except in pursuance of an appropriation previously made therefor by the municipal government? The Housing Authorities Law expressly declares that the bonds and other obligations of an Authority shall not constitute a debt of any city, county, municipal subdivision or of the Commonwealth, nor shall any city, county, municipal subdivison or the Commonwealth, or any of its revenues or property, be liable therefor. In view of that declaration, it is difficult to understand how the act in any way impinges upon these constitutional provisions. It is true that, by the terms of the Housing Coöperation Law, the various local units of government are authorized to dedicate any of their property to a Housing Authority and lend or donate money to it, but, even if the validity of this provision should be upheld later, the making of a legally authorized loan or gift would not constitute an increase of debt. The Housing Authorities are not themselves municipalities, and the Housing Authorities Law declares that they shall in no way be deemed to be instrumentalities of any city or county or engaged in the performance of a municipal function, but shall constitute public bodies exercising public powers of the Commonwealth as agencies thereof. In the light of the decisions in *Tranter v. Allegheny County Authority,* 316 Pa. 65, 81-83, and *Kelley v. Earle,* 325 Pa. 337, it cannot be successfully contended that the Commonwealth or any of its governmental subdivisions will become involved in, or can be made responsible for, the obligations of these Housing Authorities.

Finally, the acts are attacked on the ground that their titles do not each contain one clearly expressed subject. There is no justification for this criticism, or for any other directed to alleged defects or inadequacies of the titles: *Kelley v. Earle,* 325 Pa. 337, 353-355. In fact, the titles seem to be remarkably compact and unified, and, without attempting to be indices of the contents of the acts, which they need not be, they give a clear and comprehensive indication of the enactments to which they severally relate, and comply with all the requirements referred to in *Commonwealth v. Stofchek,* 322 Pa. 513, 518. There is no substantive matter included in either statute which is wholly disconnected with the legislation named in the title: *Commonwealth ex rel. Schnader v. Liveright,* 308 Pa. 35, 82. Nor are the titles vulnerable because of their failure to recite the duties incidentally imposed by the acts upon county commissioners, councils, mayors and other officers: *Idem,* p. 81. Complaint is made that the title of the Housing Coöperation Law refers to "housing projects of a Housing Authority," although this act having been signed by the Governor two days before the Housing Authorities Law, there were no "housing projects" or "Housing Authorities" at the time it went into effect; it is therefore contended that these references vitiate the title. This argument loses sight of the fact that two statutes pari materia must be construed together so as to give effect, as far as possible, to both: *Nyce v. Board of Commissioners,* 319 Pa. 353, 358, 359. This is especially true in the case of companionate acts adopted during the same session of the legislature: *Cresson Borough v. Seeds,* 286 Pa. 288, 294, 295. It may be observed, in passing, that the Housing Authorities Law and the Housing Coöperation Law were in the hands of the Governor for signature at the same time.

Curiously enough, there happens to be one provision of the Housing Authorities Law as to which the roles of some of the parties litigant are reversed, plaintiff con-

tending that section 23 of the act, which exempts Authorities and their property from all taxes and special assessments, "except school taxes," effectively and validly imposes school taxes, whereas the Philadelphia Housing Authority, one of the defendants, claims that this section brings about no such result, and that, if it were construed to do so, the imposition of such taxes would involve a violation of Article III, section 3 of the Constitution. The general exemption by section 23 from all taxes and assessments is, as previously pointed out, not only valid, but its statutory expression is unnecessary since it would have resulted from the public nature of the use of the housing projects. The exception of school taxes from the exemption, therefore, is meaningless, because, had it been intended that such taxes should be levied, it would have been necessary for the legislature not merely to "except" them from an existing exemption but affirmatively to impose them, since a tax cannot arise by implication. Thus in *Directors of the Poor v. School Directors,* 42 Pa. 21, 25, it was said: "No exemption law is needed for any public property, held as such. And declaring the poorhouse exempt from all but state and road taxes . . . is really saying nothing unless state and road taxes be also expressly laid. They are not imposed by implication." And in *County of Erie v. City of Erie,* 113 Pa. 360, 367, it was said: "Such [public] property was not taxable [before the Constitution of 1874] because there was no law which made it so. . . . The new Constitution might have made it taxable but did not. . . . It is true the legislature of 1874 did exercise its power and exempt certain property which does not include this, but the fact still remains that they did not impose taxation upon this and hence there is none." But even if the exception of the school taxes from the exemption were to be regarded as an affirmative imposition of such taxes, the provision would be invalid, because the title of the act contains no reference to imposing taxes but only to

exempting the Authorities and their property from them. In *Sewickley Borough v. Scholes,* 118 Pa. 165, an act was entitled, "An act to exempt from taxation public property used for public purposes," etc. It enumerated certain kinds of property which were to be exempt, and closed with a proviso that all property other than that in actual use and occupation for such purposes, and from which any income or revenue was derived, should be subject to taxation. It was held that since the title disclosed merely a purpose to exempt from taxation, while the proviso in the act purported to impose it, there was a violation of Article III, section 3, of the Constitution, and the proviso was void. If, here, the property were otherwise taxable, the notice in the title of its exemption would no doubt be sufficient to lead a reasonably cautious reader to inquire into the extent of the exemption,[16] but inasmuch as the property, being for public use, was not taxable in the absence of a positive enactment to that effect, one reading the title would not be expected to infer from the expression of an exemption (which was unnecessary) the fact that certain taxes were imposed by one of the provisions of the act. Our conclusion is, therefore, that section 23 of the Housing Authorities Law is not to be construed as effectively excepting school taxes from the tax exemption of the Authorities and their property, nor as imposing such taxes.

The bill is dismissed; the parties to bear their respective costs.

Mr. Justice SCHAFFER and Mr. Justice DREW dissent.

---

[16] See *Commonwealth v. Lehigh Valley R. R. Co.,* 244 Pa. 241, 246.