In Re: CONDEMNATION BY the CITY OF COATESVILLE of certain property and property interests

Property: Tax Parcel No. 38–3–25 Valley Station Road Coatesville, PA 19320

Appeal of: Estate of Patricia A. Gregory.

In Re: Condemnation by the City of Coatesville of certain property and property interests

Property: Tax Parcel No. 38–3–25 Valley Station Road Coatesville, PA 19320

Appeal of: City of Coatesville.

Commonwealth Court of Pennsylvania.

Argued Feb. 28, 2006.
Decided April 13, 2006.
Reargument Denied June 5, 2006.

Herbert Bass, Philadelphia and Andrew G. Lehr, West Chester, for appellant, City of Coatesville.

Alan J. Jarvis, Coatesville, for appellee, Estate of Patricia A. Gregory.

BEFORE: PELLEGRINI, Judge, and FRIEDMAN, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge PELLEGRINI.

■ Before us is the appeal of the Estate of Patricia A. Gregory (Estate) from an order of the Court of Common Pleas of Chester County (trial court) overruling its preliminary objections to a declaration of taking filed by the City of Coatesville (City), a home rule municipality [1] and formerly a city of the third class, under the Eminent Domain Code [2] to take property that the Estate owns in Valley Township for a public golf course.[3]

On January 4, 2002, the City filed a declaration of taking condemning real property known as Chester County Tax Parcel 38–3–25 (Property) for the purpose of creating and establishing a public golf course and related facilities (First Declaration of Taking). The notice of filing of declaration of taking identified the record owner/condemnee as the Wilmington and Northern Railroad Company among others.[4] The City served notice of the First

---

1. In 1979, the City adopted a home charter under the provisions of the Home Rule Charter and Optional Plans Law (Home Rule Law), 53 Pa.C.S. §§ 2901–3171 by referendum.

2. Act of June 22, 1964, Special Sess., P.L. 84, *as amended*, 26 P.S. §§ 1–101—1–903.

3. We quash the City's cross-appeal because it was successful before the trial court and is not aggrieved; therefore, it has no standing to appeal. Pa. R.A.P. 501. While the City cannot appeal, its arguments can be considered as additional reasons why the trial court's order should be sustained. *See* nt. 14.

4. The notice also identified as condemnees/owners of other condemned proper-

Declaration of Taking on the Wilmington and Northern Railroad Company.

▬ However, the Estate, not the Wilmington and Northern Railroad Company, was the owner of the Property at the time of the condemnation.[5] That necessitated the City, on July 21, 2004, to file a "Second Declaration of Taking" against the Estate which referenced three sections of the Third Class City Code [6] as authority

ty interests to be the Reading Company and the Philadelphia Electric Company.

5. We have simplified the facts. For those interested in slogging through this morass, this is how the Estate became involved in the litigation: by deed dated October 15, 1984, the Wilmington and Northern Railroad Company sold the Property to Howard Wilson and his wife Patricia Wilson. The Wilsons never received a copy of the deed of conveyance, and the deed was never recorded in the Office of the Recorder of Deeds of Chester County. A deed of confirmation, dated January 13, 2003, from the Wilmington and Northern Railroad Company, as grantors of the Property, to both Patricia and Howard Wilson confirming the October 15, 1984 transfer, was recorded in the Office of the Recorder of Deeds of Chester County on February 21, 2003.

Howard Wilson and Patricia Wilson were divorced on January 20, 1987, and entered into a property settlement agreement on December 5, 1986, wherein Howard Wilson agreed to the conveyance of the Property to Patricia Wilson. That conveyance was accomplished, and the deed of conveyance dated January 16, 1987, was recorded in the Office of the Recorder of Deeds of Chester County. Patricia Wilson remarried and took the name Patricia Gregory. She died on September 18, 1999.

The City learned several months after the filing of the First Declaration of Taking that Howard Wilson (Wilson) might have an interest in the Property, and as a result, filed a second declaration of taking on July 30, 2002, for the same Property but in a separate action (Second Declaration of Taking). This Second Declaration of Taking was made pursuant to Ordinance No. 1195–2002 (Ordinance), which was enacted on June 24, 2002. The notice of filing of declaration of taking identified the record owner/condemnee as the Wilmington and Northern Railroad Company and Wilson as a condemnee/owner of other condemned property interests. The City served notice of the Second Declaration of Taking on Wilson on August 2, 2002. Wilson filed preliminary objections to the Second Declaration of Taking in the belief that he was half owner of the Property. In fact, Wilson did not have any interest in the Property because he conveyed his interest in the Property to Patricia Gregory pursuant to the property settlement agreement executed in December of 1986. When Wilson discovered he was not an owner of the Property, he withdrew his preliminary objections.

On June 18, 2003, the Estate was raised, and three letters of administration for the Estate were granted to Wilson. On July 21, 2003, the City served Wilson, as Administrator of the Estate, with notice of the filing of the Second Declaration of Taking.

6. Act of June 23, 1931, P.L. 932, *as amended,* 53 P.S. §§ 35101–39701. The three sections of the Code that were cited in the Ordinance were Section 2801, 53 P.S. § 37801, Section 2403, 53 P.S. § 37403, and the most pertinent, Section 3703, 53 P.S. § 38703, which provides:

> Cities may enter upon, take, use, purchase and acquire, by gift or by the right of eminent domain, lands, property and buildings, for the purpose of making, extending, enlarging, and maintaining recreation places which shall consist of public parks, parkways, playgrounds, playfields, gymnasiums, public baths, swimming pools, or indoor recreation centers, may levy and collect such special taxes as may be necessary to pay for the same, and make appropriations for the improvement, maintenance, care, regulation, and government of the same. Cities may designate and set apart for use for any of the purposes specified in this section lands and buildings owned by such cities and not dedicated or devoted to other public use. Cities may also lease lands and buildings in such cities for temporary use for such purposes. Lands, property and buildings outside the limits of the city may be acquired in like manner for recreation places, and such lands may be annexed to the city, in the manner provided by this act for the annexation of territory to a city.

for the taking. The Estate filed preliminary objections [7] contending, among other things, that the City did not have the power to condemn the Property under the Third Class City Code because it was a home rule municipality, and it did not have the power to condemn the Property for a recreational facility because it was a proprietary business, not a public purpose. The City's preliminary objections to the Estate's preliminary objections contended that the Estate had no standing, had waived its right to file preliminary objections, and had set forth no cognizable claim.

■ On September 3, 2004, the trial court entered an order confirming that the Wilmington and Northern Railroad Company had waived its right to challenge the condemnation and that the First Declaration of Taking was "valid and in full force and effect." On June 29, 2005, the trial court entered two orders. One of the orders overruled the Estate's preliminary objections, holding that the challenge to the taking for a public purpose was premature to challenge the future use of the condemned Property. Further, even though the City was a home rule municipality, it still had the power to condemn the Property for a public golf course and other attendant recreational purposes. Both the Estate and the City appealed.[8]

### A.

■ Initially, the Estate contends that the trial court erred in overruling as premature its preliminary objection that the City could not condemn the Property because the condemnation was to advance a proprietary rather than a public use. While takings for elimination of blight might or might not result in an impermissible use of a property, the challenge might be premature because the exact nature of the use has yet to be discerned. *But see In re Redevelopment Authority of City of Philadelphia,* 891 A.2d 820 (Pa. Cmwlth.2006). Nonetheless, Section 406(a) of the Eminent Domain Code, 26 P.S. § 1–406(a), provides that the condemnee is required to raise in preliminary objections the power or right of the condemnor to appropriate the condemned property. Thus, a preliminary objection must be filed when the condemnee asserts the purpose of the take is not a public one. This has the beneficial effect that the condemning agency knows it can use the property, and the condemnee does not have its property taken for something other than a public purpose. Because the declaration of taking lists the purpose of

**7.** Preliminary objections in the context of eminent domain actions serve a different purpose than preliminary objections filed in other civil actions. *In re Condemnation of .036 Acres, More or Less, of Land Owned by Wexford Plaza Associates,* 674 A.2d 1204 (Pa. Cmwlth.1996). Not only are the Rules of Civil Procedure not applicable to eminent domain proceedings, *Gilyard v. Redevelopment Authority of Philadelphia,* 780 A.2d 793 (Pa. Cmwlth.2001), but preliminary objections filed pursuant to Section 406 of the Eminent Domain Code serve a very different purpose than those filed under the Rules of Civil Procedure. In eminent domain cases, preliminary objections are intended as a procedure to resolve expeditiously the factual and legal challenges to a declaration of taking before the parties proceed to determine damages. *North Penn Water Authority v. A Certain Parcel of Land,* 168 Pa.Cmwlth. 477, 650 A.2d 1197 (1994).

**8.** Where a trial court has either sustained or overruled preliminary objections to a declaration of taking, our scope of review is limited to determining whether the trial court abused its discretion or committed an error of law. *In re Condemnation of 110 Washington Street, Borough of Conshohocken, Pennsylvania by Redevelopment Authority of County of Montgomery, for Urban Renewal Purposes,* 767 A.2d 1154 (Pa.Cmwlth.2001).

the taking as a "public golf course, golf-related facilities and other recreational uses," the Estate's challenge to the City's power to take for those purposes is not premature.

As to whether the City has the power to take, the Estate contends that the construction of a public golf course by the City is a proprietary use, not a public use, in violation of Article 1, Section 10 of the Pennsylvania Constitution and Section 2962(c)(1) of the Home Rule Law, 53 Pa. C.S. § 2962(c)(1),[9] because there is no statutory requirement that the City operate a golf course; the public golf course business may be carried on by a private enterprise; and the purpose of a public golf course is to raise revenue for the City.[10]

 What this argument ignores is that we addressed this very issue in *In re Condemnation of Certain Properties and Property Interests for Use as a Public Golf Course,* 822 A.2d 846 (Pa.Cmwlth. 2003) (hereinafter *In re Saha*), involving the taking of land for the very same golf course. In that case, we concluded that the City's condemnation of land for the golf course and recreational use was a public use, not a proprietary use. In doing so, we relied on *Dornan v. Philadelphia*

*Housing Authority,* 331 Pa. 209, 222, 200 A. 834, 840 (1938), where our Supreme Court declared:

> The taking of land for a public golf course or playground would be for a public use although, while some players are using it, all other members of the public are necessarily excluded from utilizing or enjoying the facilities. The difference in the duration of occupancy in these various instances is one of degree. It is not essential that the entire community or even any considerable portion of it should directly enjoy or participate in an improvement in order to make its use a public one.

*In re Saha,* 822 A.2d at 856; *see also City of New Castle v. Lawrence County,* 353 Pa. 175, 44 A.2d 589 (1945) (holding that a city-owned golf course with facilities incidental to the operation of the golf course, i.e., club rooms, locker rooms, ladies' bath and restaurant, was "public property used for public purposes" for the purposes of tax exemption). Given our decision in *In re Saha,* the Estate's preliminary objection was properly dismissed by the trial court.

## B.

 Even if the taking was for a public purpose, because the City cited provisions

---

9. Article 1, Section 10 of the Pennsylvania Constitution provides, in relevant part: "No person shall, for the same offense, be twice put in jeopardy of life or limb; nor shall private property be taken or applied to *public use,* without authority of law and without just compensation being first made or secured." (Emphasis added). 53 Pa.C.S. § 2962(c)(1) provides that "[a] municipality shall not [e]ngage in any proprietary or private business except as authorized by statute."

10. For the definition of a proprietary act, the Estate relies on the test set forth in *Morris v. School District of Township of Mount Lebanon,* 393 Pa. 633, 144 A.2d 737 (1958), *overruled on other grounds by Ayala v. Philadelphia Board of Public Education,* 453 Pa. 584, 305 A.2d 877 (1973). In *Morris,* our Supreme

Court stated, "if a given activity is one which a local governmental unit is not statutorily required to perform, or if it may also be carried on by private enterprise, or if it is used as a means of raising revenue, the function is proprietary." *Morris,* 393 Pa. at 638, 144 A.2d at 739. *Morris,* which involved the death of child who drowned while playing in water at a school swimming pool in a summer program, has no application because what was involved was the proprietary/governmental distinction that was used to determine whether a local agency was entitled to common law governmental immunity which immunity was abolished in *Ayala. See State Street Bank & Trust Co. v. Commonwealth, Treasury Department,* 712 A.2d 811 (Pa. Cmwlth.1998).

contained in the Third Class City Code as authority to take the Property, the Estate contends that when the City became a home rule municipality in 1979, those provisions no longer applied because it was no longer a third class city. Absent those provisions, it then contends that the City cannot point to any authority that it has the power to take property, making the taking here illegal. The City argues that it still has the power given to it under the Third Class City Code, but even if does not, it still has the power under its home rule charter to condemn the Property. In essence, what we are being asked is to define the relationship between various municipal and county codes to home rule municipalities, and the power given to home rule municipalities by the Constitution and the laws of this Commonwealth.

Article IX, Section 2 of the Pennsylvania Constitution provides, in relevant part:

Municipalities shall have the right and power to frame and adopt home rule charters. . . . . A municipality which has a home rule charter may exercise any power or perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time.

When the General Assembly enacted Section 2961 of the Home Rule Law, 53 Pa. C.S. § 2961, it gave home rule charter communities the broadest powers and specifically required the presumption that those communities had the power to undertake the action they desired to take, and unless it was specifically denied, that action should be upheld. 53 Pa.C.S. § 2961 provides:

A municipality which has adopted a home rule charter may exercise *any*

*powers* and perform *any function* not denied by the Constitution of Pennsylvania, by statute or by its home rule charter. All grants of municipal power to municipalities governed by a home rule charter under this subchapter, whether in the form of specific enumeration or general terms, shall be *liberally construed* in favor of the municipality. (Emphasis added).

However, while the General Assembly wanted the powers it granted in the Home Rule Law to be liberally construed in favor of the municipality, Section 2962(e) of the Home Rule Law, 53 Pa.C.S. § 2962(e), provides that a home rule municipality could not enact a regulation if there was a state statute applicable to every part of the Commonwealth. It provides:

Statutes of general application.—Statutes that are uniform and applicable in every part of this Commonwealth shall remain in effect and shall not be changed or modified by this subpart. Statutes shall supersede any municipal ordinance or resolution on the same subject.

The question of whether the Third Class City Code authorization to take property remains in effect is determined by whether that provision is "uniform and applicable in every part of this Commonwealth" and if not, whether the City, as a home rule municipality, still has the authority to take the Property.

Whether a provision contained in a city or county code applicable to that particular class of city or county is a statute that is "uniform and applicable in every part of this Commonwealth" has been decided somewhat inconsistently.[11] Generally, we have held that various municipal and coun-

---

11. For an example of when a home rule municipality does not have the power to enact contrary provisions, *see Brotherhood of West Chester Police v. Borough of West Chester,* 798 A.2d 797 (Pa.Cmwlth.2002) (Act 600 applied to home rule municipalities as well as to all other cities).

ty codes are not uniform and applicable to every part of the Commonwealth because, by definition, those codes are not applicable to every part of the Commonwealth and the codes themselves are based on an exception to the uniformity provision contained in the Pennsylvania Constitution. As a result, in some cases we have held that a home rule municipality is free to adopt measures in contravention of the particular code that used to apply prior to its adoption of a home rule charter. *See County of Delaware v. Township of Middletown*, 511 Pa. 66, 511 A.2d 811 (1986); *see also Wecht v. Roddey*, 815 A.2d 1146 (Pa.Cmwlth.2002) (the adoption of a home rule charter acts to remove a municipality from the operation of the code provisions enumerating the powers of that particular class of municipality, and the Second Class County Code is not applied to every part of the Commonwealth); *see also Santangelo v. Borough of Norristown*, 789 A.2d 848 (Pa.Cmwlth.2002) (Norristown Home Rule Charter and not the Borough Code [12] controlled the manner of the appointment of the police chief); *see also Fraternal Order of Police, Fort Pitt Lodge No. 1 v. City of Pittsburgh*, 165 Pa.Cmwlth. 83, 644 A.2d 246 (1994) (City of Pittsburgh was permitted under home rule charter to establish a new procedure to allow for the hiring of experienced police officers even though it was in contravention of the Second Class City Code). In other cases, though, we have held that an individual county or city code is applicable to every part of the Commonwealth, and the home rule municipality is not allowed to change those procedures. *See In re District Attorney*, 756 A.2d 711 (Pa.Cmwlth.2000) (the Third Class County Code controlled over the Lackawanna County Home Rule Charter in the manner of filling a vacancy in the office of district attorney). Yet, in other cases, we have adopted what can best be described as a hybrid approach, holding that while a particular code still applies, a home rule municipality has the power to supplement its terms under its home rule powers. *See McSwain v. City of Farrell*, 154 Pa.Cmwlth. 523, 624 A.2d 256 (1993) (although the City of Farrell adopted a home rule charter, it is still a third class city and did not have the power under the Third Class City Code to bring actions in assumpsit to collect city liens but had the right to proceed in assumpsit under the broad powers granted to it as a home rule municipality); *see also Township of O'Hara v. Condemnation of an Easement and Right of Way for Public Purposes*, 860 A.2d 1160 (Pa.Cmwlth.2004) (where property was condemned pursuant to the provisions of the Home Rule Law and the First Class Township Code, First Class Township Code was cited as authority as power for the home rule municipality to condemn without mentioning any powers under the Home Rule Law).

While there may be some inconsistency in our case law, we need not resolve any inconsistency and can decide the relationship of the underlying municipal and county codes to a home rule municipality because no matter what we decide, the City still has the power to take the Property. If the Third Class City Code still applies, then there is no dispute that the City has the power to take the Property; if it does not apply, then the City has the power to take under the broad and expansive powers given to it under home rule because there is no uniform law applicable to all parts of the Commonwealth that would preclude the taking.[13] Because the City

---

12. Act of February 1, 1966, P.L. (1965) 1656, *as amended*, 53 P.S. §§ 45101–48501.

13. The only restriction contained in the Home Rule Law regarding eminent domain is contained at 53 Pa.C.S. § 2962(a)(2), which only

has the power to take the Estate's Property for a public golf course and other recreational purposes and those uses are a purpose, the trial court's order is affirmed.[14]

### ORDER

AND NOW, this 13th day of April, 2006, the decision of the Court of Common Pleas of Chester County, dated September 9, 2005, is affirmed.

FRIEDMAN, Judge, files a concurring opinion.

## CONCURRING OPINION BY Judge FRIEDMAN

I concur in the result reached by the majority; however, I write separately to indicate my disagreement with the majori-

ty's decision to quash the cross appeal filed by the City of Coatesville. The majority concludes that the City lacks standing to "appeal" pursuant to Pa. R.A.P. 501 merely because the City was successful before the trial court. (Majority op. at 1187, n. 3.) I would disagree with this cursory analysis.

Initially, I note that cross appeals are governed by Pa. R.A.P. 511, not Pa. R.A.P. 501. Rule 511 states that the timely filing of an appeal shall extend the time for any other party to cross appeal, thereby recognizing that, generally, the filing of a cross appeal is a proper response to the filing of an appeal. Further, the note to Rule 511 (emphasis added) states, "An appellee should *not* be *required* to file a cross ap-

precludes home rule municipalities from enacting contrary legislation regarding the procedure to take, but places no restriction on the power of home rule municipalities to take for public purposes. It provides:

> (a) Powers granted by statute.—With respect to the following subjects, the home rule charter shall not give any power or authority to the municipality contrary to, or in limitation or enlargement of, *powers granted by statutes which are applicable to a class or classes of municipalities:*
> * * *
> (2) The procedures in the exercise of the powers of eminent domain and the assessment of damages and benefits for property taken, injured or destroyed.

See also *In re Condemnation Proceeding by the Township of Lower Macungie,* 717 A.2d 1105, 1107 (Pa.Cmwlth.1998) ("The Eminent Domain Code does not confer or limit the authority to condemn, but rather is intended 'to provide a complete and exclusive procedure and law to govern all condemnations of property for public purposes . . . .' Section 303 of the Eminent Domain Code, 26 P.S. § 1–303.")

**14.** The City's now quashed cross-appeal raised two arguments. It contends that the trial court erred in finding that the Estate timely filed its preliminary objections because Wilson, the Administrator of the Estate, had

actual knowledge of the condemnation for over a year before the Estate filed its preliminary objections. What that argument ignores is that Section 406 of the Eminent Domain Code, 26 P.S. § 1–406, provides that preliminary objections must be served "[w]ithin thirty days after being served with notice of condemnation," not from the date when you have actual knowledge of the taking. Second, the City contends the trial court erred when it consolidated the First and Second Declarations of Taking at this stage of the proceedings because there is no specific provision in the Eminent Domain Code that permits consolidation. We surmise that the reason the City raises this issue is related to its argument that the disposition of the First Declaration against the Wilmington and Northern Railroad Company somehow controls the disposition of the Second Declaration of Taking against the Estate. Ignoring that the consolidation order may be interlocutory, giving us an additional reason to quash the appeal, the idea that something that occurred in the First Declaration of Taking somehow has an effect on a property interest, and a party not involved in that declaration is repugnant to the basic concepts of fairness and due process. Moreover, a consolidation order is more than appropriate at this stage of the proceedings as the value of each interest in the Property can now be determined in one proceeding before the Board of Viewers.

peal because the Court below ruled against it on an issue, *as long as the judgment granted appellee the relief it sought.*" The fact that an appellee is *not required* to file a cross appeal does *not* mean that the appellee is *prohibited* from filing a cross appeal when the lower tribunal ruled against it on an issue, and if an appellee desires to file a cross appeal to raise an issue in support of affirmance on other grounds, I believe the appellee has standing to do so.

The majority relies on Rule 501 to quash the City's cross appeal. Rule 501 (emphasis added) states that "any party who is aggrieved by an appealable order ... may *appeal* therefrom." An "appeal" must be filed within thirty days of entry of the order, whereas a "cross appeal" must be filed within fourteen days of the filing of the "appeal." *See* Pa. R.A.P. 903(b), 1113(b) & 1512(a)(2). One could logically interpret these rules to mean that, while an *appellant* must be aggrieved by an order to file an "appeal," an *appellee* need not be aggrieved by *that order* to file a "cross appeal." An appellee's purpose in filing a cross appeal is to protect against the possibility that the appellate court will reverse the tribunal below without considering issues raised before, but not considered by, that tribunal or without considering other grounds that would result in an affirmance. I submit that any party has standing to protect its interests in such a fashion.